Gail Merchant IRVING,
Plaintiff, Appellee,

v.

UNITED STATES of America,
Defendant, Appellant.

No. 96–2368.

United States Court of Appeals,
First Circuit.

Heard Sept. 10, 1998.

Decided Dec. 18, 1998.

Phyllis J. Pyles, Attorney, Torts Branch, Civil Division, with whom Frank W. Hunger, Assistant Attorney General, Paul M. Gagnon, United States Attorney, and Jeffrey Axelrad, Attorney, Torts Branch, Civil Division, were on brief, for appellant.

Paul R. Cox, with whom Matthew B. Cox and Burns, Bryant, Hinchey, Cox & Rockefeller, P.A. were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, SELYA, BOUDIN, STAHL, LYNCH and LIPEZ, Circuit Judges.

### OPINIONS EN BANC

SELYA, Circuit Judge.

Almost two decades ago, Gail Merchant Irving suffered horrific injuries in a workplace accident. She sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, claiming that inspectors employed by the Occupational Safety and Health Administration (OSHA) negligently performed their duties and thereby proximately caused her injuries. The case traveled an inexcusably long and tortuous route to a decision on the merits—a route that included four detours to this court. Ultimately, the district court, proceeding under a legal framework established by a panel of this court, concluded that the FTCA's discretionary function exception did not bar the plaintiff's claim; that the OSHA inspectors had acted negligently; and that such negligence was actionable under applicable state law. See Irving v. United States, 942 F.Supp. 1483 (D.N.H.1996) (Irving III). The court awarded the plaintiff $1,000,000 in damages. See id. at 1502.

A divided panel of this court affirmed the judgment, see Irving v. United States, 1998 WL 152941 (1st Cir. Apr. 8, 1998), but the full court, acting sua sponte, withdrew the opinion and ordered rehearing en banc, principally to review the important question of whether the FTCA's discretionary function exception foreclosed the plaintiff's negligent inspection claim. We now answer that question in the affirmative.[1]

### I. BACKGROUND

Because the district court has faithfully chronicled the tangled events that preceded this appeal, see Irving III, 942 F.Supp. at 1485–98, we offer only a synopsis. We refer the reader who hungers for greater detail to the district court's account.

In 1979, Somersworth Shoe Company operated a manufacturing plant in New Hampshire. On October 10 of that year, the plaintiff, a Somersworth Shoe employee, was stamping innersoles by means of a marker machine. At one point, she went behind her workbench to obtain materials from the die rack. In the process, she dropped a glove.

1. When the panel originally heard the appeal from the judgment in Irving III, prior circuit precedent (i.e., Irving v. United States, 909 F.2d 598 (1st Cir.1990) (Irving I), and Irving v. United States, 49 F.3d 830 (1st Cir.1995) (Irving II)) preempted the discretionary function question. Thus, the dissenting judge, while "doubt[ing] the correctness of the majority's rendition of ... federal ... law," Irving, 1998 WL 152941, at *37 (Selya, J., dissenting), premised his dissent on the theory that, under New Hampshire law, a private individual in like circumstances would not be liable in tort for the allegedly negligent inspection that forms the gravamen of the plaintiff's suit. See id. On en banc review, the federal question not only is open, but also is dispositive. Since the en banc court concludes that the OSHA inspectors' allegedly negligent conduct is exempted from the FTCA's limited waiver of sovereign immunity by operation of the discretionary function exception, see text infra, this opinion does not address the state-law question.

When she stooped to retrieve it, her hair was drawn into the vacuum created by the high-speed rotation of a drive shaft that delivered power to an adjacent "die-out" machine. She sustained grievous injuries.

OSHA compliance officers twice had inspected the plant (once in 1975 and again in 1978) under the auspices of OSHA's authority to conduct general administrative inspections, but had not noted any hazard in connection with the placement or guarding of the die-out machine in the stock fitting room or the bench assembly associated with it. Six days after Irving's mishap, OSHA conducted an inspection focused on the accident and concluded that the arrangement violated OSHA standards in three separate respects, and that all three conditions were "serious."[2] The most important of these was the company's failure to guard the drive shaft component of the die-out machine. *See* 29 C.F.R. § 1910.219(c)(2)(ii) ("Shafting under bench machines shall be enclosed by a stationary casing, or by a trough at sides and top or sides and bottom, as location requires.").

After exhausting her administrative remedies, the plaintiff invoked the FTCA and sued the United States in New Hampshire's federal district court. She alleged that OSHA's negligence in failing to note and cite the unguarded condition of the drive shaft during the two pre-accident inspections proximately caused her injuries. Had the OSHA compliance officers documented the condition of the die-out machine, the plaintiff reasoned, her employer would have taken corrective action and her injury would not have occurred.

The United States moved to dismiss the suit on the ground that the FTCA's discretionary function exception barred the plaintiff's claim.[3] The district court denied the motion. *See Irving v. United States*, 532 F.Supp. 840 (D.N.H.1982). Trial commenced on February 11, 1985, and ended three days

later. The district court took the matter under advisement, but did not act for almost three years. At that point, the court reversed its field and concluded that the discretionary function exception applied after all. *See Irving v. United States*, No. Civ. C81–501–SD, slip op. (D.N.H. Jan. 27, 1988) (unpublished). Accordingly, it dismissed the case for lack of subject matter jurisdiction.

A panel of this court vacated the order of dismissal and asked the district court to consider the impact of a newly decided case, namely, *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). *See Irving v. United States*, 867 F.2d 606 (1st Cir.1988) (table). The district court determined that *Berkovitz* did not alter the result. *See Irving v. United States*, No. Civ. C81–501–SD, slip op. (D.N.H. Feb. 14, 1989) (unpublished). The plaintiff again appealed.

A second panel of this court vacated the judgment. *See Irving v. United States*, 909 F.2d 598 (1st Cir.1990) (*Irving I* ). The panel recognized that, "[w]ere the statute and the formal regulations the only standards guiding the compliance officer's conduct, the discretionary function exception would apply." *Id.* at 603. But, the panel stated, even though these standards "give OSHA wide freedom at higher agency levels to make decisions and formulate programs," it "does not follow" that "an employee who performs an inspection has the type and breadth of discretion which makes the inspection a discretionary function." *Id.* The panel thus concluded that further analysis and factfinding were required to determine what OSHA policy actually required of OSHA compliance officers engaged in inspection activities. *See id.* As a corollary to this point, the panel noted that certain statements by OSHA's area director and the individuals who conducted the earlier inspections suggested that compliance officers may not have enjoyed discretion over how thoroughly they were

---

**2.** The Occupational Safety and Health Act (OSH Act) defines a "serious" condition as one posing "a substantial probability that death or serious harm could result." 29 U.S.C. § 666(k).

**3.** The FTCA is a limited waiver of sovereign immunity. In enacting the statute, Congress prescribed a number of situations in which the waiv-

er would not attach. *See* 28 U.S.C. § 2680. One such exception is for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

required to inspect a plant. *See id.* at 604–05. Because these statements were inconclusive, however, the panel remanded for further factfinding to determine "whether OSHA policy left the thoroughness of inspections a matter of choice for its compliance officers," and if so, "whether the inspectors had policy-level discretion to fail to note and tell the employer about the violation" which allegedly caused plaintiff's injury. *Id.* at 605.

The district court pondered matters for four more years. Eventually, the judge, relying on a partial transcript of the 1985 trial, supplemented by his own notes, leapfrogged the discretionary function exception entirely and decided the case on the merits, concluding that the United States was not negligent because the die-out machine's drive shaft was "guarded by location" at the time of the inspections and, therefore, in full compliance with OSHA regulations. *Irving v. United States,* No. Civ. 81–501–SD, 1994 WL 287750, at *3 (D.N.H. June 23, 1994). The plaintiff again appealed.

A third panel of this court vacated the judgment, discerning no basis for the "guarded by location" fact determination. *See Irving v. United States,* 49 F.3d 830, 835–37 (1st Cir.1995) (*Irving II*). The panel then addressed the government's attempted resurrection of its discretionary function defense and rejected it as foreclosed by the prior panel decision. *See id.* at 834 (noting that the panel did not feel "free to revisit" the legal conclusions explicated in *Irving I*). In the bargain, the panel dismissed the government's plaint that the Supreme Court's intervening decision in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), made a decisive difference. *See Irving II,* 49 F.3d at 834–35.

At this juncture, a different trial judge assumed responsibility for the case. Operating within the legal framework erected by *Irving I* and reinforced by *Irving II,* the district court concluded that, even though the applicable statute, regulations, and written agency guidelines appeared to grant compliance officers substantial discretion over how to conduct inspections, this discretion was restricted "by less formal, but no less binding, OSHA policy." *Irving III,* 942 F.Supp. at 1490–91. To determine the parameters of this purported policy, the district court relied exclusively on evidence adduced at the 1985 trial. It found that the testimony of the compliance officers who had conducted the 1975 and 1978 inspections and the area director who was their superior limned a policy that "required" OSHA's "wall-to-wall" inspections to be "complete" in every respect. *Id.* at 1491. This, the district court added, meant that OSHA inspectors were obligated to examine "every operational machine and work station in the plant." *Id.* Finding that the inspectors had been negligent for not examining and/or citing the die-out machine, the court held that the United States was liable. *See id.* at 1505, 1510. This appeal ensued.

## II. PROCEDURAL ISSUES

Because this case comes before us in an anomalous procedural posture, we begin by addressing a series of questions related to the justiciability of the discretionary function issue.

### A. *Forfeiture.*

█ When the United States instituted this appeal, it did not ask the panel to reverse the district court's refusal to apply the discretionary function exception. The plaintiff now seeks to convince us that this omission precludes the en banc court from considering the issue. We are not persuaded.

█ In the ordinary course, a party seeking to preserve a point for review must present it seasonably in both the trial and appellate courts and offer developed argumentation in support. *See, e.g., United States v. Bongiorno,* 106 F.3d 1027, 1034 (1st Cir.1997). Thus, a party who fails to raise a particular claim or defense at a prior stage in the litigation normally forfeits the right to assert it at a later stage. *See National Ass'n of Soc. Workers v. Harwood,* 69 F.3d 622, 627–29 (1st Cir.1995). But the instant case does not fit this paradigm neatly. Even though the United States did not hawk its basic discretionary function defense the last time around, it did assert the defense at the very beginning of this case and persistently

raised it thereafter. It was not until the final round of litigation that the government put down those cudgels.

■ The United States had good reason not to press its basic discretionary function point at that stage (either in the district court or before the fourth appellate panel). In *Irving I*, a panel of this court expressly defined the contours of the discretionary function exception. 909 F.2d at 601–05. From then on, that methodology represented both the law of the case and the law of this circuit regarding the due application of the discretionary function exception. The law of the circuit doctrine, as a general matter, permits successor panels to revise prior panel decisions in only two types of circumstances: (1) when supervening authority (such as a newly enacted statute, an intervening opinion of the Supreme Court, or a subsequent ruling of the en banc court) directly requires such a step, or (2) when newly emergent authority, though not controlling, offers a clear and convincing reason to conclude that the earlier panel would have decided the issue differently. *See Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 592 (1st Cir.1995). Indeed, when the United States asserted the discretionary function defense in *Irving II*, the panel not only took refuge in the law of the circuit doctrine to dispense the argument, but also rejected the government's importuning that the Supreme Court's 1991 decision in *Gaubert* required a modification of the prior circuit precedent. *See Irving II*, 49 F.3d at 834–35. Because two panels of this court had squarely rebuffed the government's discretionary function defense, it is hardly surprising that the government did not raise it anew in subsequent proceedings before yet another (co-equal) panel of this court. *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1583 (9th Cir.1994)

(stating that raising a point on appeal that governing state law foreclosed would have been "foolish," and excusing waiver); *see also United States v. London*, 66 F.3d 1227, 1239–240 (1st Cir.1995).

■ In sum, strong arguments can be made for not finding a forfeiture here or, at least, for not strictly applying forfeiture principles. Still, we need not definitively decide the point, for there is a simple, clearcut answer to whether the question is properly before us. After all, the discretionary function exception to the FTCA implicates the federal courts' subject matter jurisdiction. Federal courts, being courts of limited jurisdiction, have an affirmative obligation to examine jurisdictional concerns on their own initiative. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 828 (1st Cir.1997). Consequently, even if the government failed properly to raise and preserve the discretionary function defense—a question on which we take no view—we nonetheless are bound to consider it.[4] *See Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1162 n. 6 (1st Cir.1987).

■ In her supplemental brief, the plaintiff puts a somewhat different spin on the forfeiture argument. Citing a footnote in the final district court opinion, she argues that the government conceded the discretionary function question in that venue by admitting that OSHA policy required its compliance officers to "inspect every operation". *Irving III*, 942 F.Supp. at 1491 n. 8. Waiver is, of course, a matter separate from forfeiture. *See United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Be that as it may, we have reviewed the record with care and can find no such concession.[5] In any event, insofar as the plaintiff

4. Ascertaining the existence *vel non* of subject matter jurisdiction is one situation in which the en banc court is especially justified in invoking its inherent power to rehear matters of great importance. *See* Fed. R.App. P. 35(a); *see also Western Pac. R.R. Corp. v. Western Pac. R.R. Co.*, 345 U.S. 247, 262, 73 S.Ct. 656, 97 L.Ed. 986 (1953) (discussing an en banc court's *sua sponte* power to rehear cases); 16A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3981.2, at 570 (2d ed.1996). Moreover, be-

cause the discretionary function exception often involves delicate separation of powers concerns, *see United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), we likely would be justified in raising the issue even if all parties had neglected it altogether.

5. The plaintiff directs our attention to a portion of the arguments in the district court where the government's lawyer seemed to agree that OSHA

asserts that the United States has conceded the discretionary function issue, we note that parties do not possess the power to confer subject matter jurisdiction on a federal court by concession.[6] *See United States v. Horn,* 29 F.3d 754, 768 (1st Cir.1994).

## B. *Power of the En Banc Court.*

■ The procedural tangle in this case raises yet another question: may an en banc court review issues decided by panels of the court in prior appeals in the same litigation? We hold that neither the law of the case doctrine nor the law of the circuit doctrine disables an en banc court from overruling a panel decision from a prior appeal in the same case. *Accord Watkins v. United States Army,* 875 F.2d 699, 704–05 n. 8 (9th Cir. 1989) (en banc); *Shimman v. International Union of Operating Eng'rs, Local 18,* 744 F.2d 1226, 1229 n. 3 (6th Cir.1984) (en banc). The authority to overrule the decision of a prior panel in the same case flows logically from the error-correcting function of the full court. When a court sits en banc, the concern for adhering to a past resolution of an issue in deference to settled expectations, which underpins the doctrines of law of the case and law of the circuit, must give way to the institutional interest in correcting a precedent-setting error of great public import or a panel opinion that conflicts with Supreme Court precedent. *See United States v. Rivera–Martinez,* 931 F.2d 148, 151 (1st Cir.

1991) (noting that law of the case doctrine does not apply when "controlling authority has since made a contrary decision of the law applicable") (internal quotes and citations omitted); *see also Irving II,* 49 F.3d at 834 (acknowledging that the law of the circuit rule would not apply in the face of a contrary en banc opinion).

■ We are aware that the Eighth Circuit appears to have suggested otherwise. *See Robertson Oil Co. v. Phillips Petroleum Co.,* 14 F.3d 373 (8th Cir.1993) (en banc). The *Robertson* majority held that the law of the case doctrine precluded it from revisiting holdings from two earlier panel decisions because the full court had denied contemporaneous suggestions for en banc rehearings after the adjudication of both the first and second appeals. *See id.* at 376 n. 5, 383, & n. 13. We decline to follow *Robertson* for two reasons. First, in this case, unlike in *Robertson,* the en banc court was not invited to review any of the earlier panel decisions on a contemporaneous basis, and thus, did not decline to do so.[7] Second—and more important—to the extent that the *Robertson* majority's reasoning rests on mechanically applying the law of the case doctrine to the decisions of earlier panels across the board, it too narrowly cabins the proper purview of a court sitting en banc. *See id.* at 386–88 (Beam, J., with whom Bowman and Loken, JJ., join, dissenting).

inspections involved reviewing all operations in a workplace. We note, however, that counsel for the United States specifically and emphatically declined, on more than one occasion, to accept the district court's conclusion that reviewing every operation meant inspecting every machine in a plant. To the precise contrary, the United States maintained throughout the proceedings that determining the thoroughness of a workplace inspection constituted a discretionary function. Although the district court concluded that "operation" means "machine"—a matter we address *infra*—it did so upon its own initiative, not based on any concession by the United States. Furthermore, a fair reading of the only passage that even remotely permits a gloss that counsel for the United States conceded the discretionary function question reveals that counsel was responding to a hypothetical posed by the court, and qualified the response.

**6.** Citing to *Block v. Neal,* 460 U.S. 289, 294, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983), and *Indian*

*Towing Co. v. United States,* 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the plaintiff suggests that the Court has accepted similar "concessions" on the discretionary function question. The Court's statements in *Block* and *Indian Towing* cannot bear the weight that the plaintiff loads upon them. These statements merely clarify that neither case implicated the discretionary function exception.

**7.** In all events, we consider denials of rehearing en banc a very weak justification for a strict application of the law of the case doctrine. Denials of suggestions for rehearing en banc are pure exercises of discretion, and, as such, the grant or denial of rehearing en banc is the functional equivalent of a grant or denial of certiorari by the Supreme Court. Such actions make no statement about the full court's view on the merits of a claim it declines to hear. *See Missouri v. Jenkins,* 515 U.S. 70, 85, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995).

Nor does the decision in *Van Gemert v. Boeing Co.*, 590 F.2d 433 (2d Cir.1978) (en banc), create an obstacle to en banc review of a prior panel decision. There, the Second Circuit suggested that the en banc court is free to overturn prior panel decisions unless doing so would seriously and unfairly prejudice the party that had benefitted from the earlier ruling. *See id.* at 436–37 n. 9 (stating in dictum that "sitting *en banc,* we may overrule any panel decision that a majority of the active judges believes was wrongly decided, unless a party would be seriously prejudiced as a result"). Even were we prepared to adopt this formulation of the rule—a matter which we leave for another day—it would not preclude us from reviewing the holdings of *Irving I* and *Irving II.* As we have noted, the discretionary function exception implicates the subject matter jurisdiction of federal courts. Prejudice to a party, while always regrettable, cannot furnish a viable rationale for overlooking a federal court's lack of power to grant a remedy in the first place.

## III. THE DISCRETIONARY FUNCTION EXCEPTION

Having cut a swath through the procedural thicket, we turn to the government's discretionary function defense. In the process, we afford plenary review to the question of whether the discretionary function exception applies. *See National Union Fire Ins. v. United States,* 115 F.3d 1415, 1417–18 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 282 (3d Cir.1995) (en banc).

In the Court's words, "the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *United States v. S.A.*

*Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). To respond to this inquiry, we first must identify the conduct at issue and then determine whether that conduct is discretionary. *See Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267. Even if this hurdle is cleared, the discretionary function exception still does not attach unless the exercise of discretion involves (or, at least, is susceptible to) policy-related judgments. *See id.* at 322–23, 111 S.Ct. 1267.

### A. *The Statutory and Regulatory Regime.*

In this instance, the plaintiff claims that workplace inspections, negligently performed by OSHA compliance officers, proximately caused her injuries. In analyzing the nature of this conduct, we begin with the language of the OSH Act because "it will most often be true that the general aims and policies of the controlling statute will be evident from its text," *id.* at 324, 111 S.Ct. 1267, and, in turn, these aims and policies will offer valuable insights into the nature of the conduct.

In relevant part, the OSH Act authorizes the Secretary of Labor to "inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein...." 29 U.S.C. § 657(a). Under this authority, OSHA conducts both programmed general administrative inspections—known in the bureaucratic argot that OSHA so readily attracts as "full-scope" or "wall-to-wall" inspections—and more focused efforts pinpointed to threats of imminent danger.[8] Aside from a reasonableness limitation on the time and manner of inspections, the statute places virtually no constraint on the Secretary's discretion to conduct such inspec-

---

8. Under a different provision of the OSH Act, 29 U.S.C. § 657(f)(1), the Secretary "shall" conduct an inspection if a complaint by an employee about hazards in a particular workplace furnishes sufficient justification for an investigation. The scope of such inspections typically is limited to reviewing the hazardous conditions outlined in the complaint, *see, e.g., Trinity Indus., Inc. v.*

*OSHRC,* 16 F.3d 1455, 1460 (6th Cir.1994), although there are exceptions permitting broader inquiry if particular circumstances warrant, *see id.* at 1461. The 1975 and 1978 inspections of the Somersworth Shoe plant were both general administrative inspections performed under the aegis of § 657(a) and did not involve § 657(f)(1).

tions in any way that she deems fit. *See Donovan v. Dewey,* 452 U.S. 594, 601, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

Comparison of this language to a parallel provision in the Federal Mine Safety and Health Act (MSH Act), 30 U.S.C. § 801 *et seq.,* another health and safety statute administered by the Secretary of Labor, strongly suggests that Congress's choice of words was no accident. In defining the Secretary's responsibilities regarding mine inspections, the MSH Act provides that, in order to determine whether "an imminent danger exists" in a mine and "whether there is compliance with the mandatory health or safety standards or with a citation, order, or decision" issued under applicable law, "the Secretary *shall* make inspections of each underground coal or other mine *in its entirety* at least four times a year, and of each surface coal or other mine *in its entirety* at least two times a year." 30 U.S.C. § 813(a) (emphasis supplied). For our purposes, the stark differences between the inspection provisions of the MSH Act and those of the OSH Act are extremely significant. Whereas Congress was careful to mandate comprehensive inspections in the MSH Act, it left the scope and detail of OSH Act inspections to the Secretary's discretion. Had Congress wished to impose upon OSHA an obligation to inspect every corner of every plant that it visited, we think it is highly likely that Congress would have expressed its intention by choosing language comparable to that which it used in crafting the MSH Act.[9]

■ We recognize that, by its plain terms, the OSH Act confers discretion only upon the Secretary, not upon compliance officers—and it is the latter's conduct that concerns us. Nevertheless, the legislative rules governing the authority of compliance officers mimic the statute and grant these officials broad discretion over the scope,

manner, and detail of general administrative inspections. The regulations' stated goal is "to set forth general policies for enforcement of the inspection, citation, and proposed penalty provisions of the Act." 29 C.F.R. § 1903.1. Echoing the language of 29 U.S.C. § 657(a), section 1903.3 of the regulations confers upon compliance officers the unbridled power, subject only to limits of reasonableness, to enter workplaces, inspect any piece of equipment or other pertinent item, and interview any person in order to carry out the Secretary's statutory mission. *See* 29 C.F.R. § 1903.3(a).

■ To be sure, the regulations contain a sprinkling of mandatory directives. *See, e.g., id.* at § 1903.7 (obligating compliance officers, *inter alia,* to present their credentials at the start of an inspection, to use "reasonable precautions" when taking photographs and samples, to wear appropriate protective clothing, to avoid "unreasonable disruption" of the workplace, and to "confer with the employer" in order to inform him of "any apparent safety or health violations disclosed by the inspection"). Save for these and, for our purposes, other similarly innocuous details, the regulations neither mandate a particular *modus operandi* for conducting inspections nor otherwise materially restrict compliance officers' flexibility. Of particular importance, the regulations do not prescribe any specific regimen governing the scope or detail of general administrative inspections performed by compliance officers.

### B. *The Nature of the Action.*

■ Under the jurisprudence of the FTCA, a function is non-discretionary only when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954); *accord Williams*

9. This very distinction led the Supreme Court to impose an administrative warrant requirement for nonconsensual OSHA inspections, while refusing to do so for inspections under the MSH Act. *Compare Marshall v. Barlow's, Inc.,* 436 U.S. 307, 321–24, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (grounding its holding in the boundless discretion conferred by the OSH Act) *with Dewey,* 452 U.S. at 603–04, 101 S.Ct. 2534 (distin-

guishing *Barlow's* and hypothesizing the greater rigidity of the MSH Act's inspection program obviated need for a warrant requirement). While the warrant requirement has no direct bearing on the Secretary's discretion over the scope, manner, and detail of a particular inspection, we believe that the Court's method of approach and its overall appraisal of the two safety statutes is instructive.

*v. United States*, 50 F.3d 299, 309–10 (4th Cir.1995) (applying discretionary function bar because applicable regulations did not mandate a specific course of action for agent to follow when engaging managerial and custodial services); *Layton v. United States*, 984 F.2d 1496, 1502–03 (8th Cir.1993) (holding that, in the absence of specific guidelines, the manner of inspection is a matter of discretion, and distinguishing situations "in which [a] government inspector is controlled by precise regulations establishing specific steps he is required to perform in his inspections"); *Cooper v. American Auto. Ins. Co.*, 978 F.2d 602, 612 (10th Cir.1992) (holding that discretionary function exception bars negligent investigation claim absent any statute or "regulation mandating particular inquiries to be made or methods of making them"). Given the considerable leeway afforded to compliance officers under the statutory and regulatory mosaic, general administrative inspections conducted by OSHA compliance officers would seem to fit comfortably within the discretionary function exception. Indeed, two of our sister circuits have so held, *see Judy v. United States*, 864 F.2d 83, 84 (8th Cir.1988); *Galvin v. OSHA*, 860 F.2d 181, 184 (5th Cir.1988), and none has demurred.

▮ The *Irving I* panel, though clearly recognizing the discretionary nature of the authority granted by the statute and regulations, 909 F.2d at 603, nevertheless held that a further factual inquiry was needed to ascertain whether some less formal protocol "left the compliance officers with no policy-level discretion," *id.* at 603. We now reject the panel's predictive analysis.

To begin with, the *Irving I* panel appears to have accepted the plaintiff's position that, because the 1975 and 1978 inspections were "general inspections," the compliance officers' conduct was not discretionary. This conclusion suggests that the panel further assumed that general administrative inspections fall outside the scope of 29 U.S.C. § 657(a) and 29 C.F.R. § 1903.7. *See Irving I*, 909 F.2d at 603. We cannot accept this construct. As our explication of the statute and regulations demonstrates, *see supra* Part III(A), general administrative inspections are conducted under the auspices of section 657(a). The relevant regulations, moreover, explicitly grant compliance officers the same broad discretion enjoyed by the Secretary with respect to such inspections. Had the *Irving I* court not overlooked this important fact, its own logic quite likely would have led it to hold, as we do today, that the discretionary function defense prevails. *See Irving I*, 909 F.2d at 603 (acknowledging that the statute and regulations, considered alone, appear to confer discretion for covered inspections, but questioning whether they governed the actions of compliance officers).

▮ This error materially altered the decisional calculus. Because the *Irving I* panel misconstrued the applicability of the regulations to the conduct of compliance officers, it failed properly to consider when a court might justifiably consult informal policy statements in order to shed light on whether an act is discretionary. Of course, as *Irving I* suggests, informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary function exception analysis. *See Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. Hence, courts may consult such sources in appropriate cases to determine whether a particular function is (or is not) discretionary. *See, e.g., Domme v. United States*, 61 F.3d 787, 791 (10th Cir.1995) (applying discretionary function bar when none of the relevant statutes, regulations, or internal agency guidelines specified the "precise manner" in which the Department of Energy was to conduct safety appraisals); *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir.1993) (similar, re park inspections). Occasionally, such an informal policy will tip the scales. *See McMichael v. United States*, 856 F.2d 1026, 1033–34 (8th Cir.1988) (holding that when internal agency guidelines directed government inspectors to follow a detailed regime, discretionary function exception did not apply). Still, recognizing that informal sources sometimes may assist courts in deciding whether a function is discretionary is one thing; synthesizing when and how they may do so is another.

*Gaubert* itself provides some clues as to when courts ought to consult informal rules. There, the Justices indicated that such rules

become significant to the discretionary function analysis when an agency promulgates "regulations on some topics, but not on others," or when it relies on "internal guidelines rather than on published regulations" to govern official conduct. *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. The Court contrasted these situations with those in which agencies announced policy mainly through rulemaking and/or adjudication. *See id.* Thus, if an agency establishes policy primarily by promulgating legislative rules, and if those legislative rules unambiguously define the nature of the challenged conduct, the discretionary function inquiry is at an end.

Of course, this formulation requires that the legislative rules be unambiguous and that they define the proper level of conduct. We can well imagine that resort to informal indicia may be justified either when an agency's legislative rules define the conduct of some employees, but not others (e.g., when the regulations define the conduct of a regional official but not of a subordinate whose negligence is alleged to have caused the plaintiff's injury), or when legislative rules create ambiguity (e.g., when the regulations interweave precatory with quasi-mandatory language, as in *Kelly v. United States,* 924 F.2d 355, 360–61 (1st Cir.1991)). This case, however, involves neither of these circumstances, nor does it involve any other fairly comparable situation. Here, the regulations flow rationally from the enabling statute, directly address the level of conduct at issue, and unambiguously grant OSHA compliance officers discretion over the scope, manner, and details of conducting inspections. Where, as here, the statute and the applicable regulations clearly speak to the nature of the conduct, there is no occasion to consult informal rules.

In this case, moreover, our conclusion would remain unaffected even were we obliged to go beyond formal sources, for, as the regulations adumbrate, OSHA's informal rules point unerringly in the same direction. At the relevant time, OSHA published (and still publishes) a field operations manual (the Manual), which is a compilation of agency guidelines. These guidelines are intended to limn the agency's operating procedures. The Manual devotes an entire chapter to describing "General Inspection Procedures." Discussing the responsibilities of compliance officers, this chapter states in pertinent part:

> The conduct of effective inspections requires identification, professional evaluation, and accurate reporting of safety and health conditions and practices. Inspections may vary considerably in scope and detail, depending upon the circumstances of each case.

From that point forward, the chapter essentially mirrors the requirements set forth in the regulations. Importantly, the Manual contains no specific prescription mandating OSHA inspectors to proceed item by item or to cover every nook and cranny of a facility during a general administrative inspection. Consequently, even if it were necessary to consult informal rules in this instance—and we stress that it is not—those rules place the compliance officers' actions squarely in the maw of the discretionary function exception.[10]

Of course, the *Irving I* panel directed the district court to determine OSHA policy by looking beyond the clear statements in the statute, the regulations, and the agency's internal guidelines. 909 F.2d at 603–05. In the circumstances of this case, that directive should not have issued. The *Gaubert* Court instructed inferior courts to look to the requirements set forth by *"established* governmental policy" in mounting a discretionary function inquiry. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267 (emphasis supplied).

---

10. The dissent's suggestion that this case requires a different result simply because the Area Director instructed the compliance officers to conduct "wall-to-wall" inspections at the Somersworth Shoe plant, *see Post* at 178–79, is unconvincing. As we have already explained, "wall-to-wall" inspections are no more than the general administrative inspections described by the statute, regulations, and guidelines—nothing in the record supports an assertion that the Area Director's order meant anything else. Thus, the consequences of the Area Director's instructions regarding a wall-to-wall inspection are exactly the same as if the compliance officers independently had checked the general administrative inspection schedule and noted that the Somersworth Shoe plant was due for a general inspection.

The Court specifically identified only statutes, regulations, and agency guidelines as competent sources for determining government policy. *See id.* Although we do not suggest that those items invariably will be the exclusive sources for determining established policy, it bears remembering that the Court's recognition that informal rules may be a relevant source took place against a background understanding, both in administrative law generally and in the OSHA context specifically, that agencies typically make authoritative informal statements of policy positions through published interpretive rules or enforcement guidelines. *See Martin v. OSHRC*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). Although anecdotal testimony sometimes may furnish clues regarding the nature of agency policy, it is usually a last-ditch resort. *See* Kenneth C. Davis & Richard J. Pierce, Jr., 3 *Administrative Law Treatise* § 17.3, at 108 (3d ed.1994) (placing unwritten rules and "officer's habit" at the bottom of a list of twelve sources, headed by "legislative rules," and including interpretative rules, published guidelines, published policy statements, orders, and written but unpublished guidelines, and noting that the power to limit officer discretion decreases "as the reader proceeds down the list").

■■■ The most obvious reason why such sources command less weight is because it matters who speaks. To determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions. *See Martin*, 499 U.S. at 152–53, 111 S.Ct. 1171; *see also Director, OWCP v. Eastern Associated Coal Corp.*, 54 F.3d 141, 147 (3d Cir.1995). This case is a suitable vehicle for application of the principle. Congress has the legal authority to render a function either discretionary or obligatory, and it has delegated that power to the Secretary, not to OSHA's area directors or compliance officers. Hence, we decline to accord decretory significance to the area director's or compliance officers' thoughts on OSHA policy requirements, especially when the plaintiff insists on interpreting this testimony in a manner contrary to both the express statements of Congress and the agency's institutional pronouncements. *Accord Valdez v. United States*, 56 F.3d 1177, 1179–180 (9th Cir.1995) (refusing to credit agency employees' testimony that agency rules were mandatory when plain text of guidelines belied that interpretation; concluding, moreover, that discretionary function exception barred action).

■■■ We add a coda. As the *Irving I* panel itself intimated, 909 F.2d at 604–05, the trial testimony does not unequivocally establish that OSHA imposed on its officers a mandatory duty of inspecting every piece of equipment in a workplace. Rather, the testimony on which the plaintiff relies (and upon which the district court premised its holding) is at best ambiguous—and this erodes any conceivable legitimacy that it otherwise may have had as an expression of agency policy. Thus, even setting aside the statute, regulations, and Manual, we do not believe that any statement in the trial record suffices to support the plaintiff's theory that OSHA had a policy of exhaustively inspecting every machine.[11]

By way of illustration, consider the following exchange, which is perhaps the plaintiff's best evidence, between her counsel and OSHA's area director, F. Richard Amirault:

Q. And, by the way, the obligation and procedure of your department is to note and cite specific violations, is it not?

A. To note—document and—identify and document specific hazards, yes.

Q. Machine by machine by machine?

A. As far as we can see.

Q. Hazard by hazard by hazard?

A. As can be observed.

**11.** The dissent takes us to task for being insufficiently respectful of the trial court's findings of fact. *See Post* at 183–86. The dissent overlooks, however, that the lower court's crucial findings were grounded in an erroneous legal framework imposed by *Irving I* and *Irving II*. Under such circumstances, an appellate court should not defer to a trial court's factfinding. *See Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 978 (1st Cir.1995); *Juno SRL v. S/V Endeavour*, 58 F.3d 1, 4 (1st Cir.1995).

To begin with, the passage is internally ambiguous in at least one critical way. Given the tenor of Amirault's answers, it can be construed to mean that inspectors were obligated to note and document every hazard that they saw associated with the machines that they in fact inspected. At no point did Amirault state, directly or by necessary implication, that there was a policy to look at every machine.

Furthermore, even if we interpret this passage favorably to the plaintiff, it is inadequate as a matter of law to support the plaintiff's position. Where, as here, the express statements of Congress and the agency occupy the field, trial testimony by a witness must, if it is to carry any weight, somehow reconcile the witness's understanding of policy with that authority. At the very least, there must be an indication in the record that the witness demonstrated his awareness of the agency's formal policy statements, but nevertheless had some other articulable basis that supported his understanding of agency policy.

█ In the absence of such evidence, the most that is suggested by a passage such as the one quoted above is that the OSHA area director and the compliance officers who inspected the Somersworth Shoe plant subjectively exercised, or intended to exercise, the discretion conferred upon them by law in a particular manner, or, alternatively, that they were unaware of the existence of such discretion. We know from *Gaubert* that the subjective intent of an agency actor is irrelevant to conducting a discretionary function analysis. *See Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267. Rather, the focus of the inquiry is on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* The OSHA officers' ambiguous testimony in this case is by itself insufficient to alter the nature of the actions as defined by authoritative formal and informal sources.

There are also passages in the trial record where Amirault refers to OSHA guidelines. This testimony further undermines the plaintiff's theory. For example, when plaintiff's counsel asked Amirault about the Manual, Amirault responded that it was OSHA's "procedural bible" and, as such, described his

staff's "operating procedure." He unequivocally stated that inspections were conducted pursuant to directions set forth by the Manual:

Q. So that for any general or regular inspection at least they [i.e., the compliance officers] would simply follow the manual and the objective standards of OSHA?

A. Right. Following the manual, the FOM, Field Operations Manual.

This cinches the matter, for, as we have already noted, the Manual provides no support for the plaintiff's theory.

Our conclusion is further confirmed by other statements made by Amirault. Consider, for instance, the following exchange:

Q. And those programmed inspections, as I understand it, would be your random way of just doing spot checks on an entire plant without advance notice?

A. Yes, that's correct.

Q. And those are the type of inspections that your agency performed on the Somersworth plant in 1975 and 1978?

A. Yes.

Q. We've learned through the depositions that those two inspections were what is known as a wall-to-wall inspection, is that correct?

A. I'm going to say yes.

Q. And in such an instance, when one of your safety men goes to a plant, he would spend the whole day or whatever time was necessary to inspect the entire plant for safety hazards.

A. He would be able to walk through, yes.

Read naturally, this passage indicates that general administrative inspections constitute nothing more than "walk throughs" that involve random spot checks. As such, it flatly contradicts the suggestion that the inspectors "could not choose simply to spot check certain areas," *Irving I,* 909 F.2d at 604, and it places the inspection scheme squarely within the *Varig Airlines* regime. On any reading, the passage does not come close to establishing that OSHA had a strict policy of requir-

ing inspectors to look in detail at every machine.

### C. *Policy–Based Discretion.*

■ Having confirmed the existence of discretion on the compliance officers' part, what remains is to examine whether that discretion is grounded in policy—a question that none of the prior panels reached. We believe that it is.

■ The plaintiff contends that the discretionary function defense is doomed because the United States failed to adduce any evidence to support the proposition that OSHA inspectors' actions are grounded in policy. This argument lacks force. When a function is discretionary, there is a presumption that "the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. Hence, the United States has no burden of production; it may rest, as it did here, on the *Gaubert* presumption.

■ The plaintiff next endeavors to overcome the *Gaubert* presumption by pointing to trial testimony by OSHA employees and noting that they purportedly failed to articulate policy justifications for their actions. But *Gaubert* requires only that a government agent's actions be "susceptible" to policy analysis, and insists that courts must disregard analyses that rely on subjective intent to determine whether a discretionary choice is policy-driven. *See id.* at 325, 111 S.Ct. 1267. Because the plaintiff offers no concrete challenge to the position that OSHA compliance officers' actions are policy-driven, the *Gaubert* presumption remains intact.

■ Even beyond the presumption, we believe that the discretion granted to OSHA inspectors is deeply rooted in policy considerations. The OSH Act's purpose is to provide for a satisfactory standard of safety, not to guarantee absolute safety. *See Industrial Union Dep't v. American Petroleum Inst.*, 448 U.S. 607, 646, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion) (discussing legislative history); *Donovan v. General Motors Corp.*, 764 F.2d 32, 35–36 (1st Cir.1985) (same); *cf. Union of Concerned Scientists v. NRC*, 824 F.2d 108, 118 (D.C.Cir.1987) (citing *Industrial Union* and stating, in the context of nuclear regulation, that an "adequate protection" standard "need not, and almost certainly will not" be a level of "zero risk"). A corollary to this observation is that OSHA may legitimately devote its limited enforcement resources to monitoring workplaces and working conditions that pose the most serious threats to worker health and safety. OSHA has done so in part, for example, by adopting inspection priorities [12] and an administrative plan to govern programmed general inspections. *See, e.g., Industrial Steel Products Co. v. OSHA*, 845 F.2d 1330, 1333–34 (5th Cir.1988) (describing OSHA site selection criteria for programmed inspections).

The function of an OSHA compliance officer is an integral part of OSHA's enforcement policies. When conducting inspections under the auspices of an administrative plan, OSHA compliance officers are expected to study the layout of the facility they are about to investigate, to review its health and safety records, and to interview employer and employee representatives during the inspection about working conditions. One might expect that as a result of such study, OSHA inspectors will make daily judgments about what risks and safety issues most urgently require their attention. At bottom, OSHA inspectors must visit numerous workplaces, all of which present different challenges and issues, and they simply cannot be expected to inspect every item in every plant.[13] The day-to-day

---

12. The Manual establishes OSHA's inspection priorities in descending rank order as follows: imminent danger, fatality/catastrophe investigations, investigation of complaints, and regional programmed inspections.

13. The plaintiff's contrary argument espouses the logic of zero tolerance for any kind of risk. The indiscriminate application of this logic as a guide for policy has met with considerable criticism.

*See, e.g.,* Stephen Breyer, *Breaking the Vicious Circle* 11–19 (1993). Although the political branches legitimately may decide to impose "zero risk" standards, *see, e.g., NRDC v. EPA*, 824 F.2d 1211, 1215–16 (D.C.Cir.1987), courts must be hesitant to impose such a gloss in the absence of an explicit congressional command or proper grant of agency discretion, *see, e.g., Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214–15 (5th Cir.1991).

decisions made by compliance officers thus further OSHA's enforcement policy of ensuring adequate safety in workplaces with a view toward efficient and effective use of limited enforcement resources, and are thus grounded in policy. *Cf. Gaubert,* 499 U.S. at 331–33, 111 S.Ct. 1267 (explaining that day-to-day decisions of thrift regulators were grounded in policies underlying thrift regulation statutes).

■ We are not persuaded by the plaintiff's contention that all inspections ought to be painstakingly comprehensive because individual companies rely on OSHA inspections to improve their health and safety conditions. The OSH Act, in no uncertain terms, places primary responsibility for workplace safety on employers, not on the federal government. *See* 29 U.S.C. § 654(a); *Reich v. Simpson, Gumpertz & Heger, Inc.,* 3 F.3d 1, 4 (1st Cir.1993).

## IV. CONCLUSION

■ This case has disturbing aspects. The government's inspectors appear to have been negligent and the plaintiff suffered grievous harm. Arrayed in opposition, however, is the core policy that underlies the discretionary function exception: an abiding concern about exposing the government to far-flung liability for action (or inaction) in situations in which it has reserved to its own officials the decision about whether or not to act. Even if the decision may seem wrong in retrospect, or if its implementation is negligent, such decisionmaking by its nature typically requires a balancing of interests (e.g., how to deploy scarce government resources in the accomplishment of worthwhile—but expensive—public needs). Congress reasonably struck this balance by requiring that, ordinarily, liability will not inhere absent an authoritative decision that a specific act should become a governmental responsibility. Under this model, the random and uncodified practices of a local supervisor cannot create the kind of specific obligation that gives rise to liability. Were the law otherwise, there would be scant likelihood of precision or uniformity, and local supervisors would have a perverse incentive to refrain from laying down any rules at all.

We need go no further. Even though exceptions to the FTCA's waiver of sovereign immunity are construed narrowly, they are not to be ignored. Here, Congress clearly expressed its intent through unequivocal statutory language, and the Secretary of Labor, as Congress's delegate, adopted legislative rules which faithfully adhere to that monition. The statute and regulations, fairly read, bring the case within the compass of the FTCA's discretionary function exception, and the agency's internal guidelines buttress this positioning. Accordingly, we must grant the government the immunity that Congress envisioned. We regret only the plaintiff's unfortunate accident and the added suffering she has endured due to the inordinate delay and erratic decisionmaking that spawned two decades of needlessly protracted litigation.

***Reversed. No costs.***

STAHL, Circuit Judge (concurring).

Despite strong reservations, I joined the withdrawn panel opinion, *see Irving v. United States,* 1998 WL 152941 (1st Cir. Apr.8, 1998), because I was then bound by the interpretation of the discretionary function exception set forth in *Irving v. United States,* 909 F.2d 598 (1st Cir.1990) (*Irving I*). Having endorsed the decision of the *en banc* court to revisit *Irving I,* I now concur in the view, ably stated in Judge Selya's majority opinion, that the discretionary function exception forecloses plaintiff's negligent inspection claim. Although the issue is close and no Supreme Court case is directly on point, I do not believe that, in a regulatory context that is so obviously discretionary, Congress would intend to make actionable under the FTCA an ignored instruction from a superior to a subordinate that the subordinate perform a function that is otherwise discretionary (for policy-based reasons). To my mind, an ignored instruction of this sort is better conceptualized as an abuse of the discretion conferred by the regulatory regime. Such abuses of discretion are not within the reach of the statute. *See* 28 U.S.C. § 2680(a).

BOWNES, Senior Circuit Judge, with whom LIPEZ, Circuit Judge, joins (dissenting).

The majority opinion fundamentally misconstrues controlling Supreme Court prece-

dent in analyzing the discretionary function exception to the Federal Tort Claims Act ("FTCA"). The majority is concerned that permitting Irving's claim to succeed would undermine OSHA's broad discretion in deciding how to implement its enforcement policy. No one disputes that the agency as a whole retains considerable discretion. The problem is that the majority undertakes its analysis from the wrong vantage point.

As the Supreme Court has made clear, the appropriate focus is the degree of choice that was in fact available, not to the agency as a whole but to the specific "acting employee" whose conduct is the basis for the tort action. *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The discretionary function exception shields the government from lawsuits challenging governmental action only if that specific action was based on discretion grounded in policy. *See id.* The exception was intended to protect only such specific policy-based judgment. The present case involves no second-guessing of protected policy-making.

A parallel problem is the majority's mischaracterization of Gail Irving's position. Irving does not contend "that all [OSHA] inspections ought to be painstakingly comprehensive." Maj. Op. at 168. Her claim, properly construed, is that once inspectors have been ordered by their supervisor to perform a wall-to-wall inspection, they must do so with due care. Irving argues that if the inspectors had followed their superiors' orders, she would not have had her scalp torn from her head. Thus, she contends that the negligent inspections were not protected by the discretionary function exception because the inspectors had "no rightful option but to adhere to the directive" of their superior officer. *See Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954.

Because in my view the district court properly concluded that the exception does not bar Irving's claim,[14] I respectfully dissent.

I

The FTCA, except for certain enumerated exceptions, "waives the Government's immunity from suit in sweeping language." *Smith v. United States*, 507 U.S. 197, 205 n. 1, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (quoting *United States v. Yellow Cab Co.*, 340 U.S. 543, 547, 71 S.Ct. 399, 95 L.Ed. 523 (1951)). The FTCA authorizes suits against the United States for damages

> for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant under the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). The FTCA is a "broad waiver of sovereign immunity," which "generally authorizes suits against the United States for damages" that fit within its description. *Berkovitz*, 486 U.S. at 535, 108 S.Ct. 1954. This waiver applies unless the

14. The majority finds to the contrary and concludes that, because of the discretionary function exception, it is without jurisdiction to entertain Irving's suit. In contrast, the dissent from the withdrawn panel opinion was based on the belief "that state law, properly applied, requires the entry of judgment in the government's favor." *Irving v. United States*, 1998 WL 152941, *37 (1st Cir.1998) (*Irving IV*). It did not discuss the discretionary function exception at all or, indeed, any aspect of the panel's treatment of federal law. The dissent from the panel opinion mentioned not a word about the purported "precedent-setting error of great public import," maj. op. at 160, or about the overriding importance of the discretionary function exception's "implicat[ion of] the subject matter jurisdiction of federal courts," *id.* at 161. I find it remarkable that, until the en banc opinion issued, nothing was said about the lack of jurisdiction, because of the discretionary function exception, by the dissenting judge who is the writer of the majority opinion. Surely the framework of the case did not preclude comments about an issue that is now the basis for the majority's opinion. As the majority itself stresses on page 160 of its opinion, "[f]ederal courts, being courts of limited jurisdiction, have an affirmative obligation to examine jurisdictional concerns on their own initiative." Thus, contrary to the majority's protestations at page 157 n.1, members of the prior panel were certainly not precluded from commenting on the jurisdictional issue that the en banc court now raises. I do not question the court's authority to call *sua sponte* for en banc review, but I question its judgment and wisdom in doing so here.

government is protected by one of several specifically enumerated exceptions to the FTCA.[15]  *Id.; see* 28 U.S.C. § 2680.

The majority opinion relies upon the discretionary function exception, which provides that no liability shall lie for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Congress's purpose in enacting the discretionary function exception was to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *see also Berkovitz,* 486 U.S. at 539, 108 S.Ct. 1954. Thus, the exception was designed to protect government agents' exercise of policy-based discretion, to prevent individual government agents from having to look over their shoulders worrying about a potential lawsuit when they are truly exercising policy-based discretion.

The same protective rationale does not apply when government agents are merely carrying out mandatory directives, whatever the basis of those mandatory orders. If a government employee has no choice about how to act—whether because a statute, regulation, or agency policy mandates particular actions for all such employees, or for whatever other reason (here, because his supervisor explicitly ordered him to conduct a wall-to-wall inspection)—then "there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954.

Thus, the Court has set forth a two-prong test to determine whether the discretionary function exception applies. First, the acting government employee must be exercising discretion, when he engages in the challenged conduct. And second, even when government agents are exercising discretion, their conduct is immune from tort suits only when that discretion is based on policy. The exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, 108 S.Ct. 1954.

## II

The majority misses an important part of the Supreme Court's analysis of the discretionary function exception: from what vantage point should the court view the conduct of government agents? In this case, what level of OSHA employees is the proper focus for our attention? "The proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance." *In re The Glacier Bay,* 71 F.3d 1447, 1451 (9th Cir.1995). Instead, the majority focuses on the discretion of the agency as a whole, at the command level.[16]  This fundamental misconception of the discretionary function exception infects the majority's entire analysis. It leads the majority to misunderstand Irving's claim and to misapply the law governing the discretionary function exception.

## A

Section 2680(a) refers to two different types of discretion: (1) the "performance ... [of] a discretionary function or duty on the part of a federal agency" and (2) such "performance ... on the part of ... an employee of the Government." The majority's analysis centers on the first type. Citing both the statute and the regulations, it emphasizes that the agency as a whole had discretion in carrying out its statutory inspection functions. Of course it did. If the plaintiff had challenged OSHA's hypothetical decision to conduct inspections upon only a random sample of factories, or a supervisor's decision to

---

**15.** Thus it is the government's burden to demonstrate that an exception applies. In the present case, the burden of proof should be on the government to show that OSHA explicitly delegated to inspectors Chase and Ritchie the discretion to determine how thoroughly to inspect the Somersworth Shoe plant. The majority opinion im-

plicitly flips this burden on its head, and requires the plaintiff essentially to disprove the exception's applicability.

**16.** *See* Part III, *infra.*

omit Somersworth Shoe from that sample, or an order that the inspectors conduct only a spot check and not a wall-to-wall inspection of Somersworth Shoe, then I would agree with the majority that her claim must be dismissed based on the discretionary function exception.[17]

But that is merely the first type of discretion addressed in § 2680(a) ("performance ... [of] a discretionary function or duty on the part of a federal agency"). The plain language of the statute requires a distinction between this type of discretion and the second type: "performance [of] ... a discretionary function or duty on the part of ... an employee of the Government." 28 U.S.C. § 2680(a). The latter is the focus of Irving's complaint.

Here, OSHA exercised its discretion, at the command level of the agency, about how to allocate its scarce resources. It delegated to each area office a certain amount of discretion to conduct various types of inspections. Pursuant to that delegation, as Irving alleged and the district court found, the area office here decided to deploy its inspection resources by calling for less than complete inspections of some factories but, in the case of Somersworth Shoe, by requiring wall-to-wall inspections of its New Hampshire plant. The area director instructed two members of his staff, inspectors Chase and Ritchie, to examine every machine in the plant. *Irving v. United States*, 942 F.Supp. 1483, 1491 & n. 8 (D.N.H.1996).

Thus, the agency's discretionary policy decisions were completed as soon as the area director made his "wall-to-wall" decision; the agency had committed itself to this undertaking, before the inspectors set foot on the premises of Somersworth Shoe. It was after

these discretionary policy decisions had been completed that the inspectors negligently executed the agency's policy, giving rise to the injuries suffered by the plaintiff. At that point, Chase and Ritchie, the inspectors, had "no rightful option but to adhere to the directive" from their supervisor and examine every machine in the plant. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. The conduct of Chase and Ritchie "cannot appropriately be the product of judgment or choice, [so] there is no discretion in [their] conduct for the discretionary function exception to protect." *Id.*

B

The plain language of the statute is only one reason why the majority is wrong to focus only on the upper levels of the agency—rather than the inspectors whose actions Irving is challenging—for determining whether the discretionary function exception applies. Controlling Supreme Court precedent likewise demonstrates the majority's error. The principal Supreme Court case explicating the discretionary function exception is *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).[18]

The Court's opinion exposes the majority's error in three different ways: (1) in the Court's analysis of the discretionary function exception, (2) in the Court's discussion of prior Supreme Court precedent, to harmonize those cases with the *Berkovitz* analysis, and (3) in the Court's application of its legal analysis to the facts of Berkovitz's claims. Because of the importance of the *Berkovitz* case, and because this court is duty-bound to faithfully apply Supreme Court precedent, I will discuss each of these in some detail.

---

**17.** But that is not what this case is about. Irving does not challenge area director Amirault's discretionary decision that the inspectors perform a wall-to-wall inspection of Somersworth Shoe. She applauds it, and wishes the inspectors under Amirault's supervision had carried out his mandate. It is the inspectors' negligent execution of Amirault's mandatory order to them that Irving challenges.

**18.** Astonishingly, the majority opinion fails even to discuss this seminal case. The majority reaches back to overrule *Irving I* and *Irving II* but inexplicably fails to discuss the *Berkovitz* decision

which prompted those opinions. In both *Irving* opinions, which were unanimous, we directed the district court to determine, in the light of *Berkovitz*, whether the discretionary function exception applied. The majority evidently thinks *Berkovitz* is now beside the point, at least for its purposes. The opinion mentions that the district court and a prior panel of this court relied on *Berkovitz*, but in rejecting those panel decisions, the majority does not itself discuss or distinguish—much less apply—the Supreme Court's analysis or holding in *Berkovitz*.

1

The *Berkovitz* Court set forth clearly the mode of analysis that we should employ in cases such as this:

> The determination of whether the discretionary function exception bars a suit against the Government is guided by several established principles. This Court stated in *Varig* that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." In examining the nature of *the challenged conduct*, a court must first consider whether the action is *a matter of choice for the acting employee*. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice.

*Id.* at 536, 108 S.Ct. 1954 (citation omitted) (emphasis added).

The Court's methodology, which was plainly not followed by the majority in this case, requires that we ask what "conduct" is "challenged" by the plaintiff in the particular case, determine which employee in the agency has engaged in that conduct, and then consider "whether the action is a matter of choice for the acting employee." *Id.*

The Court's focus on "the acting employee" is equally plain from the next passage of *Berkovitz:*

> [T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, *the employee has no rightful option but to adhere to the directive.* And if *the employee's conduct* cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect. *Cf. Westfall v. Erwin,* 484 U.S. 292, 296–97, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988) (recognizing that conduct that is not

the product of independent judgment will be unaffected by threat of liability).[19]

*Id.* (citation omitted; emphasis added).

The Court could not have been more clear that, when we examine whether there is "discretion in the [challenged] conduct for the discretionary function exception to protect," we must focus on the individual employee whose "conduct" is "challenged" by the plaintiff. Here, that is Chase and Ritchie. The challenged conduct is their failure to inspect the die-out machine that injured Irving, despite having been ordered by their supervisor to inspect every machine. Where, as here, the acting employee has been ordered by his supervisor to proceed in a certain manner, and the plaintiff is seeking recompense for injuries resulting from that employee's failure properly to follow that command, then it is irrelevant that "the statute places virtually no constraint on the Secretary's discretion to conduct such inspections in any way that she deems fit," maj. op. at 162, or that OSHA's generally applicable "rules governing the authority of compliance officers mimic the statute and grant these officials broad discretion over the scope, manner, and detail of general administrative inspections," *id.* at 162.

Of course the Secretary and her top assistants have broad discretion in managing the agency's enforcement enterprise, as do any subordinate officials to whom that discretion is properly delegated. But this does not mean that front-line inspectors have any discretion once decisions have been made by their superiors in the hierarchy and a mandatory directive has been given to the inspectors.

The Court in *Berkovitz* moved on to the second prong of its analysis: even "assuming the challenged conduct involves an element of judgment," was that judgment based on policy? There, too, the Court looked at this question at the level of the individual whose actions are challenged by the plaintiff in the

**19.** The Court's reference to *Westfall* recognizes the purpose of immunizing certain government conduct from ordinary tort liability. Unlike tort suits brought against non-governmental defendants, the Court does not want the possibility of being sued for negligence to chill a government official from exercising "independent judgment" when such is appropriately part of his or her job serving the public. *See Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755 (noting Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort").

case at hand: "The exception, properly construed, ... protects only governmental *actions* and *decisions* based on considerations of public policy. In sum, the discretionary function exception insulates the Government from liability if *the action challenged in the case* involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954 (citation omitted; emphasis added). Again, the focus is on the particular "action challenged in the case"—the shoddy inspection by Chase and Ritchie—and not on whether the agency as a whole—or even a supervisor like Amirault—"exercise[s] ... policy judgment." *See id.; In re The Glacier Bay*, 71 F.3d at 1451.

### 2

The *Berkovitz* Court next discussed prior Supreme Court precedent, to demonstrate how those prior decisions fit into the Court's analytical framework. This discussion again stresses the importance of keeping the analysis focused at the level of the acting government employee.

The Court first analyzed the actions challenged in *Varig Airlines*, namely, the FAA's negligence in certifying certain airplanes for operation, including its decision to certify the airplanes without first inspecting them.

> Congress had given the Secretary of Transportation broad authority to establish and implement a program for enforcing compliance with airplane safety standards. In the exercise of that authority, the FAA, as the Secretary's designee, had devised a system of "spot-checking" airplanes for compliance. Th[e Supreme] Court first held that the establishment of that system was a discretionary function within the meaning of the FTCA because it represented a policy determination as to how best to "accommodat[e] the goal of air transportation safety and the reality of finite agency resources."

*Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954 (quoting *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755). Applying this portion of the analysis to the present case, OSHA's broad discretion in devising its methodology for conducting inspections, whether "spot-check-

ing" or some other method, is protected under the discretionary function exception.

But the Court's analysis did not end there. *Varig Airlines* also held that the discretionary function exception protected "the acts of FAA employees in executing the 'spot-check' program," because under this program the employees "were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources." *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755. The *Berkovitz* Court added the following explanation: "Thus, the Court [in *Varig Airlines* ] held the challenged acts protected from liability *because they were within the range of choice* accorded by federal policy and law and were the results of policy determinations." *Berkovitz*, 486 U.S. at 538, 108 S.Ct. 1954 (emphasis added).

This second set of actions—executing the "spot-check" program—is not analogous to the *Irving* situation. The crucial distinction is that *Varig* 's spot-check protocol left the FAA's line-level employees with a "range of choice" based on "policy" judgments. In contrast, the OSHA inspectors in *Irving* were not executing a "spot-check" protocol; they were specifically ordered by their superiors to inspect every machine. They thus had zero "range of choice." *Berkovitz*, 486 U.S. at 538, 108 S.Ct. 1954. They had no discretion, whether based on policy judgment or otherwise, to decide unilaterally during their inspection of the Somersworth plant not to inspect the die-out machine that caused Irving's injuries. These inspectors' shoddy execution does not involve "the necessary element of choice," grounded in policy, *United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), that the discretionary function exception was intended to protect.

*Berkovitz* also analyzed *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), as "illuminat[ing] the appropriate scope of the discretionary function exception." *Berkovitz*, 486 U.S. at 538 n. 3, 108 S.Ct. 1954. The plaintiff in *Indian Towing* sued the government for failing to

maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment. *See Indian Towing,* 350 U.S. at 69, 76 S.Ct. 122. Thus, if the agency had instead exercised its discretionary judgment to decline such an undertaking, the government would be insulated from tort liability. This is analogous to OSHA's decision whether to undertake a wall-to-wall inspection of the Somersworth Shoe plant.

"The Court [in *Indian Towing* ] held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA," because "[t]he latter course of conduct did not involve any permissible exercise of policy judgment." *Berkovitz,* 486 U.S. at 538 n. 3, 108 S.Ct. 1954. The failure by agency employees to exercise ordinary care in carrying out an undertaking that the government agency willingly undertook is not protected by the discretionary function exception. This latter aspect of *Indian Towing* is analogous to the OSHA inspections challenged in the present case.

### 3

A third aspect of the *Berkovitz* decision further undermines the majority's focus on the discretion permitted to be exercised by the highest levels of OSHA. In Part III of its opinion, the Court discussed the specific actions that the *Berkovitz* plaintiffs challenged. The Court's mode of analyzing each of the five possible claims illuminates how our court should have examined the applicability of the discretionary function exception.

The Division of Biologic Standards (DBS) of NIH had issued a license to Lederle Laboratories to produce a drug called Orimune. The plaintiffs alleged that DBS issued the license without first receiving certain data that the manufacturer was required to submit showing its compliance with regulatory safety standards. The Court held that the discretionary function exception did not bar a cause of action based on this allegation, because the statute and regulations "require, as a precondition to licensing, that the DBS receive" that data, and DBS had "no discretion to issue a license without first receiving the required test data." *Berkovitz,* 486 U.S. at 542, 108 S.Ct. 1954. The actor in *Berkovitz* was whatever level of the agency made the decision to issue the license. Viewing the facts from that vantage point, there was "no discretion ... for the discretionary function exception to protect" because of the statutory mandate.

The plaintiffs in *Berkovitz* also alleged that DBS licensed Orimune without complying with other regulatory standards. The allegation was ambiguous and the Court explored three different possible interpretations.[20] Under a DBS regulation, DBS "may not issue a license except upon an examination of the product and a determination that the product complies with all regulatory standards." *Berkovitz,* 486 U.S. at 544, 108 S.Ct. 1954. Thus, if the plaintiffs were "aver[ring] that the DBS licensed Orimune either without determining whether the vaccine complied with regulatory standards or after determining that the vaccine failed to comply, the discretionary function exception does not bar the claim." *Id.* at 544, 108 S.Ct. 1954. This is because "[t]he agency has no discretion to deviate" from its "clear duty," i.e., from the procedures mandated by its own regulations.

The Court applied a different analysis to the third possible interpretation of the plaintiffs' claim: that the agency found Orimune to comply with regulatory standards but that the agency's conclusion was incorrect. This question "hinges on whether the *agency officials making that determination* permissibly exercise policy choice ... in determining that a vaccine product complies with the relevant safety standards." *Id.* at 545, 108 S.Ct. 1954 (emphasis added). Because the record was unclear on this point, the Court remanded for appropriate findings by the district court.[21]

---

**20.** The case came up on a motion to dismiss, so the Court did not have the benefit of a fully developed factual record, as we have here.

**21.** In *Irving II,* we remanded to the district court for similar findings, as to whether Chase and Ritchie had any discretion to "permissibly exercise policy choice" in failing to inspect the die-

The *Berkovitz* plaintiffs made another allegation: that DBS had approved the release of the particular lot of Orimune that contained Kevan Berkovitz's dose, and the agency violated federal policy in approving the release of that lot. The Court therefore considered whether the discretionary function exception applied to the release of a particular lot of the vaccine, as distinct from the issuance of a license to produce the drug. The regulations governing particular lots do not impose a duty on DSB to ensure that the vaccines comply with regulatory standards, nor do they require DSB to inspect every lot. Instead, "[t]he regulations generally allow [DSB] to determine the appropriate manner in which to regulate the release of vaccine lots, rather than mandating certain kinds of agency action." *Id.* at 546, 108 S.Ct. 1954.

Given this regulatory context, the discretionary function exception bars any claims that challenge [DSB's] formulation of policy as to the appropriate way in which to regulate the release of vaccine lots. *Cf.* [*Varig Airlines,* 467 U.S.] at 819–20[, 104 S.Ct. 2755] (holding that discretionary function exception barred claim challenging FAA's decision to establish a spot-checking program). In addition, if the policies and programs formulated by [DSB] allow room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion. *Cf. id.* at 820[, 104 S.Ct. 2755] (holding that discretionary function exception barred claim that employees charged with executing the FAA's spot-checking program made negligent policy judgments respecting the proper inspection of airplanes). The discretionary function exception, however, does not apply if *the acts complained of* do not involve the permissible exercise of policy discretion. Thus, if [DSB's] policy leaves no room for *an official* to exercise policy judgment *in performing a given act,* or if the act *simply does not involve the exercise of such judgment,* the discretionary function exception does not bar a claim that *the act* was negligent or wrongful. *Cf.*

out machine, in light of the factual circumstances of this case. It is those factual determinations,

*Indian Towing v. United States,* 350 U.S. at 69[, 76 S.Ct. 122] (holding that a negligent failure to maintain a lighthouse in good working order subjected the Government to suit under the FTCA even though the initial decision to undertake and maintain lighthouse service was a discretionary policy judgment).

*Berkovitz,* 486 U.S. at 546–47, 108 S.Ct. 1954 (emphasis added).

This passage again makes clear the Court's view that, in determining whether a particular (allegedly negligent) act is exempt from the FTCA under the discretionary function exemption, *Berkovitz* requires us to examine the particular government agent who "performed [the] given act," and to determine whether particular conduct is discretionary by looking at the "range of choice" the agency has delegated to the particular employee in performing the task in question.

The plaintiffs in *Berkovitz* had alleged that DBS had

adopted a policy of testing all vaccine lots for compliance with safety standards and preventing the distribution to the public of any lots that fail to comply. [Plaintiffs] further allege[d] that *notwithstanding this policy,* which allegedly leaves no room for implementing officials to exercise independent policy judgment, employees of [DBS] knowingly approved the release of a lot that did not comply with safety standards. Thus, [plaintiffs'] complaint is directed at a governmental action that allegedly involved no policy discretion.

*Id.* at 547, 108 S.Ct. 1954 (citation omitted; emphasis added).

The *Berkovitz* Court held that, "[i]f those allegations are correct—that is, if [DBS's] policy did not allow the official who took the challenged action to release a noncomplying lot on the basis of policy considerations—the discretionary function exception does not bar the claim." *Id.* It was therefore improper to dismiss plaintiffs' claim regarding the release of the particular lot of vaccines. *See id.* at 548, 108 S.Ct. 1954.

and the judgment for Irving resulting therefrom, that are before us now on appeal.

The *Berkovitz* lot release allegations are analogous to Irving's claim that the "implementing officials" at OSHA (the line-level inspectors, Chase and Ritchie) were "le[ft] no room ... to exercise independent policy judgment" because their supervisors mandated that they follow a particular inspection protocol.[22] *Id.* at 547, 108 S.Ct. 1954. Thus, as in *Berkovitz,* we must parse the distinction between a regulatory agency's higher-level exercise of discretion in determining agency policy and procedure—which is exempt under § 2680(a)—and the implementation of that policy by the official who took the challenged action—which is exempt only if the employee himself is given his own policy-based discretion to "exercise independent policy judgment" in how to carry out his job. *Id.*

The staff employee's implementation conduct is *not* exempt from the FTCA if the employee has no choice but to comply with a higher-level mandate. And it makes no difference whether that higher-level mandate comes from an agency regulation that adopts a policy for all employees, saying they all must follow a particular procedure in all particular situations, or whether the higher-level mandate comes to the line-level employee from his or her immediate supervisor as the manner in which to conduct his inspection of this particular plant.[23] The question is whether the individual "employee's conduct can[ ] appropriately be the product of judgment or choice" on his part; if not, then "there is no discretion in the conduct for the discretionary function exception to protect." *Berkovitz,* at 536, 108 S.Ct. 1954.

## C

The Court's most recent FTCA discretionary function case, *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), is fully consistent with this approach.

The plaintiff in *Gaubert* challenged the allegedly negligent manner in which federal bank regulators had offered advice and made recommendations to a savings and loan institution. He argued that "the discretionary function exception protects only those acts of negligence which occur in the course of establishing broad policies, rather than individual acts of negligence which occur in the course of day-to-day activities." *Id.* at 334, 111 S.Ct. 1267. The Court rejected the plaintiff's distinction between policy-making and operational decisions, reaffirming *Berkovitz*'s focus on whether the actions of the particular government employee "involv[ed] the necessary element of choice" that was grounded in regulatory policy. *Id.* at 323, 111 S.Ct. 1267.

The Court offered the example of a federal official negligently driving an automobile while on a mission connected with his official duties, concluding that "the [discretionary function] exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Id.* at 325 n. 7, 111 S.Ct. 1267. The exception is no more applicable to Irving's case: even if the majority can somehow muster an argument that a compliance inspector has discretion to refuse to follow his supervisor's direct order about how thoroughly to inspect a particular plant, any such discretion "can hardly be said to be grounded in regulatory policy." *Id.*

In contrast, the regulators' actions that Gaubert challenged were within their range of policy-based discretion. They included replacing the bank's management; urging it to convert to federal charter; intervening with a state regulatory agency; advising the hiring of a financial consultant; advising when to place a subsidiary into bankruptcy; advis-

---

**22.** Because *Berkovitz* came up on a motion to dismiss, the Court remanded the case, giving plaintiffs the opportunity to make the required factual showing in support of their allegations. In this procedural respect, the present *Irving* appeal is not analogous. We previously ordered such a remand, and, as discussed *infra* at Part VI, here the plaintiff has already made the requisite factual showings and the district court has made findings that support her claims.

**23.** It is true that the Court in *Berkovitz* did not discuss the example of a mandate from a supervisor. But, as discussed *supra,* it did offer a great variety of illustrative examples, all of which show that we have to look at whether the *individual employee* actually has policy-based discretion to take the actions which the plaintiff is challenging in the lawsuit.

ing on litigation policy; and mediating salary disputes. These are not at all analogous to Chase and Ritchie's negligent failure to inspect every machine in the Somersworth Shoe plant, in contravention of the direct order of their supervisor to do so.

D

Unlike the majority here, other circuits have followed the Supreme Court's teachings in analyzing discretionary function cases. For example, in *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031–32 (9th Cir.1989), the Ninth Circuit held that a claim that the government negligently constructed a canal was not barred because the "contracting officer's on-site decisions" were not based on "policy judgments," and hence "were not of the nature and quality that Congress intended to shield from tort liability." In *Phillips v. United States*, 956 F.2d 1071 (11th Cir.1992), the Eleventh Circuit held that the exception was not applicable to a claim that the Army Corps of Engineers failed to exercise due care in carrying out mandatory safety obligations. In *Murdock v. Employers Ins. of Wausau*, 917 F.2d 1065 (8th Cir.1990), the court held the exception did not preclude a claim that the government failed to ensure that proper procedure was followed in conducting excavation work. And in *Cope v. Scott*, 45 F.3d 445, 449 (D.C.Cir.1995), the Third Circuit held that the exception did not apply to the claim that the government had failed to post adequate warning signs of dangerous road conditions.

III

It is true that the majority pays lip service to the appropriate focus: "We recognize that, by its plain terms, the OSH Act confers discretion only upon the Secretary, not upon compliance officers—and it is the latter's conduct that concerns us." Maj. Op. at 162. But the majority then shifts its focus. It bases its analysis not on the scope of discretion actually delegated to the two inspectors whose conduct is challenged in the instant case, but rather on regulations [24] and manu-

als that generally grant OSHA compliance officers broad discretion in the conduct of their inspections. *Id.* at 162–63.

The majority overstates the significance of the OSH Act and the relevant guidelines. According to the majority, "the statute and applicable regulations clearly speak to the nature of the conduct" at issue in this case. But they do not. The statute does not unambiguously permit inspectors to perform incomplete inspections, nor does it clearly leave discretion to the individual inspectors to decide just how comprehensive inspections must be, regardless of direct instructions from their superior officers. Rather, the statute only confers jurisdiction on the Secretary to perform inspections, and says nothing at all about how comprehensive they must be.

The majority finds it "[o]f particular importance" that "the regulations do not prescribe any specific regimen governing the scope or detail of general administrative inspections performed by compliance officers." *Id.* at 163. But neither do the regulations preclude all supervisors from exercising any independent authority in managing the agency's work force. Regulations setting forth OSHA's general enforcement authority vis-a-vis employers do not speak to the question of how the agency may organize its staff into a hierarchy of managers, various levels of supervisors, and line-level subordinate staff. As the Court stated in *Gaubert* in an analogous situation, there is "no prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation." 499 U.S. at 330, 111 S.Ct. 1267. The majority cannot seriously read OSHA's general regulations, applicable agency-wide, to transform OSHA supervisors into automatons who must tell all subordinate inspectors nothing more than "go out and exercise your own broad discretion."

Thus, the regulations cannot be read to deprive a supervisor, in this case the area director, of all authority, in a particular set of circumstances, to issue a specific instruction

---

24. The majority notes that "the legislative rules governing the authority of compliance officers mimic the statute and grant these officials broad

discretion over the scope, manner, and detail of general administrative inspections." Maj. Op. at 163.

mandating that a particular compliance officer take specific actions when inspecting a particular factory (in this case, instructions as to the degree of thoroughness of the inspection). Surely, a subordinate compliance officer cannot refuse such an instruction on the theory that supervisory direction would violate the broad discretion given to him or her in the regulations. A subordinate employee does not have the "discretion" to disregard a direct order from his supervisor merely because there is no regulation or other "established governmental policy" that specifically requires such action of all inspectors in all circumstances. In the present case, it is enough that one particular area director, Amirault, did prescribe certain limitations on compliance inspectors Chase and Ritchie, with respect to their inspections of the Somersworth Shoe factory.

The majority ignores Amirault's direct order because, it asserts, " 'wall-to-wall' inspections are no more than the general administrative inspections described by the statute, regulations, and guidelines." Maj. Op. at 165 n.10. Whatever may be true of the ordinary case, the facts of this case are different and require a different result. It is true that the general language of the statute, regulations, and guidelines ordinarily permit inspectors to exercise "the same broad discretion enjoyed by the Secretary with respect to such inspections." Maj. Op. at 164. But in *this* case, area director Amirault ordered inspectors Chase and Ritchie to do more than merely conduct a general administrative inspection; he ordered them to "look at the entire plant." "As far as humanly possible, [Chase and Ritchie] were supposed to cover the work place" and "observe any place where the employee works," "look[ing] at every operation" and "observing and documenting any violative condition." These facts were found by the district court and its factual findings are supported by record evidence and are not clearly erroneous. *See* Part VI, *infra.*

Even the government recognizes that the district court's finding—that Chase and Ritchie were required, in their "particular inspections," to "inspect every operational machine in the plant"—was "limited to the specific factual circumstances it found existed during the time and area covered by Mr. Amirault's testimony." Gov't Br. to Panel at 4–5 n.1. Indeed, such limitation is the reason why the government decided not to "appeal the court's finding regarding the application of the discretionary function exception to this case." *Id.*

The proper inquiry therefore becomes whether Chase and Ritchie in fact retained any policy-based discretion, in failing to carry out Amirault's specific order to perform a wall-to-wall inspection. The majority's sweeping discussion of overall OSHA discretion in handling its inspections utterly fails to address this inquiry, and it certainly contains no support for the kind of affirmative response that would justify application of the discretionary function exception. On the contrary, it is clear from the facts as found by the district court that the answer to the proper question is "no," and the exception is inapplicable. If, as the district court found, inspectors Chase and Ritchie had no such discretion, *see* Part VI, *infra,* then they had "no rightful option" about what action to take, and therefore the discretionary function exception does not apply, *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954.

The majority cites *Gaubert* for the proposition that "informal agency rules and similar pronouncements may at times bind agency personnel for the purposes of discretionary function exception analysis." Maj. Op. at 164 (citing *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267). This still focuses on generally applicable "pronouncements."

What the majority fails to recognize is that a supervisor's mandate to a subordinate agency official will "bind" the subordinate in the conduct of his official duties, every bit as much as "agency rules," formal or informal. Such a binding order will preclude the subordinate from exercising discretion to any extent other than that allowed within the supervisor's command. Thus, "for the purposes of discretionary function exception analysis," courts should consult such individualized constraints "in appropriate cases to determine whether a particular function is (or is not) discretionary." Maj. Op. at 164.

In sum, the majority fails to follow the Court's guidance on the most fundamental question. The majority focuses its analysis on the discretion that OSHA and its command-level employees enjoy to determine how it will enforce the Act, including how thoroughly to inspect any given factory. The majority fails to apply the Court's analysis which centers on the extent of discretion exercised by the particular agency employee whose actions are challenged by the plaintiff. This focus should prevail at both steps of the *Berkovitz* analysis.

Here, it is difficult to see *any* policy judgment in negligently carrying out a commanded inspection or in flouting a supervisor's direct order. But even if some such discretion did exist, we still have to reach *Berkovitz*'s step two, which asks whether such discretion was based in political, social, or economic policy, for Congress intended to "protect[ ] only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267 (quoting *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954). And any discretion Chase and Ritchie might have enjoyed to negligently carry out a commanded inspection "can hardly be said to be grounded in regulatory policy." *Id.* at 325 n. 7, 111 S.Ct. 1267.

## IV

In its attempt to apply the appropriate legal doctrine here, the majority opinion repeatedly distorts Irving's theory of the case,[25] characterizing it as alleging "that OSHA had a policy of exhaustively inspecting every machine," Maj. Op. at 166; "that OSHA had a strict policy of requiring inspectors to look in detail at every machine," *id.* at 167; "that all inspections ought to be painstakingly comprehensive," *id.* at 169; "expect[ing] [OSHA inspectors] to inspect every item in every plant," *id.*; and "zero tolerance

for any kind of risk," *id.* at 168 n. 13.[26] The majority then bravely shoots down this straw man.

But it bears no relationship to Irving's theory of the case. The conduct that Irving challenges is Chase and Ritchie's failure to inspect every machine in the Somersworth Shoe factory after receiving binding instructions from their supervisor to do so. She does not argue that OSHA inspectors must "inspect every item in every plant." Maj. Op. at 168–69. With respect only to the Somersworth Shoe plant, Amirault had already weighed the competing policy interests and concluded that this particular inspection must be wall-to-wall, with every machine inspected and every violation documented. Thus, the two inspectors who actually visited the Somersworth plant had no choice about how extensively to inspect; there was no room for them to exercise judgment or consider agency policy concerns when it came to determining whether to skip any machines; they had no discretion in the matter at all, whether driven by policy or otherwise. They had orders and they were to follow them. The fact that OSHA's upper management had a great deal of discretion to choose various methods of enforcement in deciding which plants around the country to inspect, whether to do spot checks for some and wall-to-wall inspections for others, is quite irrelevant from the point of view of the "Government agent[s]" whose "acts" the Court told us to scrutinize in cases like this. *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267; *see Berkovitz*, 486 U.S. at 536, 547, 108 S.Ct. 1954. In this rare case, those higher officials had already chosen to exercise their discretion in a particular way, and their actions in so deciding are not being challenged here.

The majority makes much of the fact that OSHA's resources are limited and that OSHA must be permitted discretion to

25. This is essentially the flip side of its blurring the distinction between generally applicable rules granting discretion, on the one hand, and, on the other hand, the fact-specific question of whether Chase and Ritchie actually had any discretion in Irving's case. *See* Part II, *supra*.

26. The majority writes: "Importantly, the Manual contains no specific prescription mandating

OSHA inspectors to proceed item by item or to cover every nook and cranny of a facility during a general administrative inspection." Maj. Op. at 165. Of course the Manual contains no such prescription. It is not a general requirement, applicable to all inspections at all times. But Irving simply alleges that the area director decided to order a wall-to-wall inspection in this case, at this plant, at this time.

choose how best to allocate such resources. But Irving does not challenge OSHA's allocation of resources any more than she challenges OSHA's enforcement policy in general or the decision to inspect one site rather than another. Rather, she challenges only the thoroughness with which the inspection was carried out after the decision had been made to inspect this particular site in a particular way, i.e., after the inspectors were specifically instructed to conduct wall-to-wall inspections. The Eleventh Circuit's admonition is also applicable to OSHA (and virtually all federal agencies):

> "Because resources are limited, it is axiomatic that discretion must be used in allocating available resources.... Nevertheless, this does not mean that a federal employee's every choice is a policy judgment shielded from liability through the operation of the discretionary function exception."

*Phillips*, 956 F.2d at 1075.

The majority blurs the distinction, implicitly lumping together Irving's claim with a theoretical challenge to high-level agency resource-allocation decisions. This fundamental failure carefully to parse her claim is contrary to the Supreme Court's own detailed practice, as evidenced by *Gaubert* and *Berkovitz*, and it infects the majority's entire analysis. *See, e.g., Murdock*, 917 F.2d at 1073 (carefully distinguishing between claims, barring claim concerning decision as to what procedure should be used to conduct excavation but not precluding claim as to government's "failure to ensure that procedure was followed").

Moreover, as noted *supra*, while the Supreme Court has rejected a rigid dichotomy between high-level and operational decisions, *see Gaubert*, 499 U.S. at 326, 111 S.Ct. 1267, the relative place of the individual within the hierarchy does shed some light on the question of whether that "acting employee's" conduct is of the kind that Congress would have shielded. *See id.* at 335, 111 S.Ct. 1267 (Scalia, J., concurring); *Coumou v. United States*, 114 F.3d 64, 65 (5th Cir.1997) (recognizing some difference "between decisions at a planning level, or decisions that exercise policy judgment, and decisions at a[n] opera-

tional level, or decisions that are merely incident to carrying out a government policy."). In particular, here, a line-level inspector is not the kind of OSHA official who normally makes policy judgments as to how the agency should deploy its scarce resources. Nor is there any evidence in the record or other reason to believe that Chase or Ritchie were in fact authorized to exercise such discretion in connection with Somersworth Shoe.

Irving's claim, properly construed, is that, once inspectors have been ordered to perform a wall-to-wall inspection, they must do so with due care. Her claim does not implicate OSHA's resource allocation discretion at all. Not only has the government failed to identify a specific policy empowering on-site inspectors to determine how thoroughly to conduct inspections, it has utterly failed to provide any support for its naked assertion that such a decision is actually "grounded" in any policy decisions. This case simply does not involve second-guessing broad policy choices.

## V

A number of other legal errors flaw the majority opinion.

## A

The majority distorts Supreme Court precedent in the very framing of its analysis. It states: "Under the jurisprudence of the FTCA, a function is non-discretionary *only* when a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267 (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954)." Maj. Op. at 163 (emphasis added). There is no basis in law for that position.

The word "only" does not appear in either *Gaubert* or *Berkovitz* in connection with the quoted passage. The Supreme Court has never required that a plaintiff show that the acting agent is a bureaucratic automaton. Rather, it has repeatedly made clear that "[t]he so-called discretionary function exception ... does not protect all governmental activities involving an element of choice." *Gaubert*, 499 U.S. at 335, 111 S.Ct. 1267

(Scalia, J., concurring) (citing *Berkovitz*, 486 U.S. at 536–37, 108 S.Ct. 1954). In the passage quoted by the majority, the Court was merely explaining, by way of illustration, that the government could not satisfy "the requirement of judgment or choice" if a specific prescription existed in the statute, regulation or policy. But the Court has never said that, absent such a clear statement, embedded in formal law, a particular function is therefore purely discretionary. Indeed, in *Gaubert*, the Court essentially said the contrary: "[T]here was no prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation." 499 U.S. at 330, 111 S.Ct. 1267; *see also id.* at 326, 111 S.Ct. 1267 ("[T]he distinction in *Dalehite* [v. *United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) ] [between decisions made at a planning rather than operational level] was merely description of the level at which the challenged conduct occurred. There was no suggestion that decisions made at an operational level could not also be based on policy.").

Moreover, the Court plainly has never raised the threshold on the first prong so high, as the majority does today, as to make it virtually impossible to satisfy.[27] To require a plaintiff to show that the "acting employee" has no discretion at all is tantamount to requiring the plaintiff to disprove the government's entitlement to the exception, and expands the discretionary function exception so much that it swallows the rule of waiver of sovereign immunity. But these exceptions should be read narrowly. As the Court stated in *Kosak v. United States*, 465 U.S. 848, 854 n. 9, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984):

> Though ... the exceptions to the Tort Claims Act should not be read in a way that would "nullif[y them] through judicial interpretation," [citation omitted], unduly

generous interpretations of the exceptions run the risk of defeating the central purpose of the statute. *See United States v. Yellow Cab Co.*, 340 U.S. 543, 548 n. 5, 71 S.Ct. 399, 95 L.Ed. 523 (1951); *cf. Block v. Neal*, 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983) ("The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.") [internal quotation marks omitted]. We think that the proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify "those circumstances which are within the words and reason of the exception"—no less and no more. *See Dalehite v. United States*, 346 U.S. 15, 31, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

### B

The second prong of *Berkovitz*'s analysis of the discretionary function exception—whether the challenged inaction "is of the kind that the ... exception was designed to shield," i.e., grounded in policy—is critical, for the exception, at its heart, seeks to prevent second-guessing of governmental policy decisions. True, "there is a presumption that 'the agent's acts are grounded in policy,' " where an agency official is found to be exercising discretion. Maj. Op. at 168 (quoting *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). But the majority fails to recognize that the presumption is rebuttable. It may be overcome by evidence such as Irving presented here, demonstrating that these particular officials were not balancing competing policy concerns when they failed to inspect the die-out machine during their inspection of the Somersworth Shoe factory, after being instructed by their supervisor to inspect every machine.[28]

---

**27.** The majority's position would require a plaintiff to demonstrate that no possible discretion could be exercised by the acting government official, in order to satisfy the first of the two *Berkovitz* prongs.

**28.** In addition, as Justice Scalia has explained, "[o]rdinarily, an employee working at the operational level is not responsible for policy decisions, even though policy considerations may be

highly relevant to his actions." *Gaubert*, 499 U.S. at 335, 111 S.Ct. 1267 (Scalia, J., concurring). It makes sense to consider whether the acting employee's decision was one that "ought to be informed by considerations of ... policy and is made by an officer whose official responsibilities include assessment of those considerations." *Id.* Hence, it is less likely that tort suits challenging the actions of low-level employees

The majority erroneously treats the presumption as a *strong* one, such that "the United States has no burden of production; it may rest, as it did here, on the *Gaubert* presumption." Maj. Op. at 168. The result of this front-loaded approach is that the second prong will almost always be satisfied once the first has been met. This approach is contrary to *Berkovitz* and *Gaubert,* and also to the weight of authority in other circuits that have properly acknowledged the overriding purpose of the exception: to protect against impermissible second-guessing of express policy judgments.[29]

It is admittedly difficult to determine whether a decision or task is based on political, social or economic policy, for "nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope,* 45 F.3d at 448. The majority's approach permits decisions by low-level employees involving the faintest hint of choice to fall within the exception. But as courts have repeatedly warned, such a front-loaded approach "would not only eviscerate the second step of the analysis set out in *Berkovitz* and *Gaubert,* but it would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity." *Cope,* 45 F.3d at 449 (holding that exception did not apply to claim that government failed to post adequate warning signs of dangerous road conditions); *see also Duke v. Department of Agric.,* 131 F.3d 1407, 1411 (10th Cir.1997) (agreeing with D.C. Circuit that applying exception to governmental decision involving a "hint of policy concern" eviscerates the second prong of *Berkovitz* ).[30]

A somewhat analogous situation may be seen in the cases involving a failure to warn of a danger to health or safety. In such situations, the actor who failed to warn is similar to inspectors Chase and Ritchie here: if the acting employee had warned of the danger, the plaintiff would not have been injured. And, similarly, the failure to warn was not based on balancing competing policy interests. Some courts have consistently held that "a failure to warn involves considerations of safety, not public policy" and that except for the rare case where failure to warn implicates "broad, policy-making activities" the discretionary function exception is inapplicable in failure to warn cases. *Faber v. United States,* 56 F.3d 1122, 1125 (9th Cir.1995); *see also Boyd v. United States,* 881 F.2d 895, 898 (10th Cir.1989) (failure to warn swimmers of dangerous conditions "does not implicate any social, economic, or social policy judgments with which the discretionary function exception properly is concerned."); *Andrulonis v. United States,* 952 F.2d 652 (2d Cir.1991) (highranking official's alleged failure to warn of hazards associated with rabies vaccine not barred by exception).

### C

The majority's analysis seems to reinstate the "regulatory function exception" which the government urged upon the Court in *Berkovitz* but which the Court explicitly rejected. *See Berkovitz,* 486 U.S. at 538–39, 108 S.Ct. 1954. Without any basis in the Act, the government had proposed that the Court transform the discretionary function exception into a "regulatory function exception" that would apply § 2680(a) to "preclude[ ]

---

can be said to result in a second-guessing of important public policy decisions, which is what the exception is intended to prohibit.

**29.** Unlike today's majority, those circuits have kept the main goal of the exception in focus by giving meaning to the second prong. *See Cope,* 45 F.3d at 449 ("nature" of exempt decision must be "fraught with ... public policy considerations."); *see, e.g., Gotha v. United States,* 115 F.3d 176, 181 (3d Cir.1997) (rejecting applicability of exception where claim involved Navy's failure to provide safeguards to pathway); *Andrulonis v. United States,* 952 F.2d 652, 654 (2d Cir.1991) ("Policy considerations ... remain the touchstone for determining whether the discre-

tionary function exception applies."); *Routh v. United States,* 941 F.2d 853, 857 (9th Cir.1991) (contracting officer's on-site decisions not so rooted in policy as to bar claim alleging failure to use proper safety equipment); *Kennewick Irrigation Dist.,* 880 F.2d at 1031–32; *Phillips,* 956 F.2d at 1075.

**30.** Courts have also held the government to fail the second prong on evidentiary grounds, where the record does not support its contention that the challenged decision was "grounded in policy." *See, e.g., In re The Glacier Bay,* 71 F.3d at 1450 ("When the record does not show that a decision is based on ... policy considerations, the exception does not apply.").

[government] liability for any and all acts arising out of the regulatory programs of federal agencies." *Id.* at 538, 108 S.Ct. 1954. The government had argued that regulatory programs by their nature entail agency discretion at the highest levels to weigh various competing policy interests. Based on the statute's plain language and the legislative history, the Court "put the Government's argument to rest," *id.* at 539, 108 S.Ct. 1954, concluding that "Congress intended the discretionary function exception to apply to the *discretionary* acts of regulators, rather than to all regulatory acts," *id.* at 539 n. 4, 108 S.Ct. 1954.

The majority's decision today resurrects the government's discredited "regulatory function" theory. Because the larger agency (OSHA) has broad discretion over its enforcement authority (as all regulatory agencies clearly will), the majority's approach would exempt from tort liability virtually all actions taken by employees of regulatory agencies, without looking at whether the acting employee, whose conduct is the basis of the suit, actually had "no rightful option but to adhere to [a] directive" from his supervisor. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954.

## VI

In addition to its erroneous interpretation of Supreme Court precedent, the majority inexplicably fails to adhere to the well-established "clearly erroneous" standard of review for district court findings of fact. *See* Fed. R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

The district court found the following facts: (i) in 1975 and 1978, the OSHA compliance officers each had been directed to perform a "wall-to-wall" safety inspection of the Somersworth plant; (ii) although the OSH Act and OSHA regulations leave many decisions regarding the conduct of workplace inspections to the discretion of the area director and compliance officers, the scope of the inspections of the Somersworth plant that the compliance officers were instructed to perform in 1975 and 1978 "was dictated by less formal, but no less binding, OSHA policy," requiring the officers to "inspect every operational machine and work station in the plant," and to record every violation of OSHA safety standards that they observed— be they *de minimis*, non-serious, or serious—if there was potential employee exposure to the violative condition; (iii) the die-out motor drive shaft was not guarded by location at the time of the accident; (iv) at the time of the accident, the die-out machine was in materially the same condition, and was at or near the place it had been located during the 1975 and 1978 inspections, and, therefore, the drive shaft had not been guarded by location at the time of these inspections; (v) the die-out machine was in near-continuous operation during the relevant time period, and was in operation during both inspections; (vi) operation of the die-out machine while the drive shaft remained unguarded was in flagrant violation of OSHA safety standards; (vii) during the 1975 and 1978 inspections, the compliance officers failed to document, and OSHA failed to cite, the violative condition of the drive shaft; (viii) had the compliance officers actually inspected the bench assembly, they would have noticed and documented the violative condition of the drive shaft. 942 F.Supp. at 1492–502.[31]

31. Four OSHA employees testified at the 1985 bench trial: Richard Amirault, the area director at the time of the 1975 and 1978 inspections; William Chase, the compliance officer who conducted the 1975 inspection; John M. Ritchie, the compliance officer who conducted the 1978 inspection; and Paul O'Connell, the senior safety engineer who conducted the 1979 post-accident inspection.

Amirault testified that OSHA compliance officers were "charged to look at the entire plant"; that, in conducting a wall-to-wall inspection, the compliance officers "were supposed to make a complete walk-through and identify and document any hazardous conditions that they would see"; and that, "[a]s far as humanly possible, [the inspectors] were supposed to cover the work place" and "observe any place where the employee works." Although Amirault repeatedly testified that the compliance officers were required only to report the violations they observed—e.g., "If we could spot the unsafe condition, it should be cited."—he also testified that the inspectors "should look at every operation" and "should be observing and documenting any violative condition."

The district court concluded from the evidence that the record would not support a finding that OSHA compliance officers Chase and Ritchie—both of whom the court found to be experienced workplace safety inspectors who took their jobs seriously—were so utterly incompetent as to have inspected the bench assembly but failed to notice the unguarded condition of the drive shaft and to recognize it as a violation of OSHA standards. Instead, the preponderance of the evidence "decidedly supports the conclusion that both Chase and Ritchie would have recognized that the bench assembly violated OSHA safety standards requiring the guarding of power transmissions *if they had, in fact, inspected it,*" and that the only realistic explanation for their failure to notice and document the unguarded drive shaft was that neither officer actually inspected the bench assembly during his inspection of the Somersworth plant. 942 F.Supp. at 1497 (emphasis added). The district court thus determined that the challenged conduct, and the basis for Irving's state-law cause of action and FTCA claim, was the failure of the compliance officers to inspect every operational machine in the Somersworth plant in 1975 and 1978, as they were required to do by mandatory OSHA policy, and their negligent

performance of their task. *Id.* "[T]hey were under a mandatory duty to inspect every operational machine and failed to do so." *Id.* at 1502.

The majority never analyzes the district court's findings of fact under the proper standard of review: whether they were clearly erroneous. *See* Fed.R.Civ.P. 52(a). In particular, the majority fails to accord appropriate deference to the district court's findings, as the "clearly erroneous" standard requires. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504 (explaining that the same deference is required to district court's "inferences drawn from other facts"); *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1138 (1st Cir.1995) ("[A]n appellate court must refrain from any temptation to retry the factual issues anew.").[32]

Instead, the majority examines the evidence for itself and second-guesses the district court's findings, making its own findings of fact. That would be fine, if this court were the trial court. But the district court heard the evidence and reached a contrary set of factual determinations. This court has no basis for disturbing those findings. *Arthur D. Little, Inc. v. Dooyang Corp.,* 147

Chase conceded that it would have been carelessness for a compliance officer to have missed the violative condition of the drive shaft. He testified that, in 1975, "I made a complete inspection of the facility as I am required to do and made notes, et cetera, of everything that I observed." While acknowledging that inspectors occasionally fail to notice violative conditions, Chase testified that, if the bench assembly were in the same location at the time of his 1975 inspection as it was at the time of the accident, he could not have failed to recognize the condition of the drive shaft as a serious violation of OSHA standards. He stated, "I deny anybody to say they haven't [made a mistake] but not something that obvious." And, "I wouldn't miss something like that; it's too obvious, positively." He also stated, "[T]here's no way I'd have missed that setting right out in the wide open on a main aisle in ... the stock fitting room. No way." According to Chase, no compliance officer who looked at the bench assembly would have failed to recognize the unguarded drive shaft as a serious violation, even on the officer's worst day. Amirault and O'Connell concurred in Chase's conclusion that the violation was both obvious and serious, with Amirault conceding that a prudent inspector who saw the bench assembly depicted in O'Connell's post-accident photographs

should have noticed the unguarded condition of the drive shaft and recognized it as a violation of OSHA safety standards.

32. The majority explains this failure by stating that "the lower court's crucial findings were grounded in an erroneous legal framework," so "an appellate court should not defer to [the] trial court's factfinding." Maj. Op. at 166 n.11. It is true that appellate courts should not defer to a trial court's factual findings which actually result from an erroneous application of law to the facts of the case. But that is not what happened here. The district court here found *historical* facts, e.g., facts that describe what Amirault ordered Chase and Ritchie to do, and what the inspectors in fact did (or did not do) in response to that order. These historical facts have nothing to do with the question whether the district court later examined those facts through an incorrect legal lens. *See Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 7 (1st Cir.1997); *State Police Ass'n of Mass. v. Commissioner of Internal Revenue,* 125 F.3d 1, 5 (1st Cir.1997). As to such historical facts, appellate courts must defer to the trial court's factual findings unless they are clearly erroneous. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504; *Johnson,* 63 F.3d at 1138.

F.3d 47, 54 (1st Cir.1998) (Where the "district court's findings of fact are not clearly erroneous," the appellate court "will not disturb them.").

The district court's findings are plainly supported by the record in this case; at the very least, they are not so lacking in support as to be clearly erroneous. Nothing in the record indicates that Amirault ordered inspections in 1975 and 1978 that were anything other than wall-to-wall inspections, or that the OSHA compliance officers were at liberty to choose to conduct a spot-check inspection of only some, not all, machines or areas within the plant. In all events, the government does not now dispute that the compliance officers in 1975 and 1978 were obliged to conduct wall-to-wall safety inspections; indeed, the government's attorney conceded at oral argument before the district court that "[i]f there's a requirement to look at every machine and he does not look at every machine, then I would agree that that's a violation of a mandatory regulation." 942 F.Supp. at 1499 n. 19.

Moreover, the means by which the majority carries out its own fact-finding mischaracterizes the trial testimony. An example appears in the majority opinion at 167. The majority quotes a series of questions and answers and then summarizes them as follows: "Read naturally, this passage indicates that general administrative inspections constitute nothing more than 'walk throughs' that involve random spot checks." This summary is not at all accurate. The "natural" reading of Amirault's testimony is not that the inspector, once inside the plant, would "spot check" only some machines; rather, OSHA's "random way of just doing spot checks on an entire plant without advance notice," maj. op. at 167, more likely meant that OSHA chose at random which plant to inspect. Regarding the Somersworth inspections in particular, Amirault testified that, once inside the plant, the inspector was to conduct "a wall-to-wall inspection," spending "whatever time was necessary to inspect the *entire plant* for safety hazards," *id.* at 167 (emphasis added), "machine by machine by machine," *Irving,* 942 F.Supp. at 1491 n. 8. If the majority's "spot-check" finding of fact were made by a district court, an appellate tribunal would be compelled to strike it as clearly erroneous. The district court's findings to the contrary were plainly correct, and surely pass muster under the clearly erroneous standard of review.[33]

In discussing the ordinary procedures for conducting inspections, the majority notes that "OSHA compliance officers are expected to study the layout of the facility they are about to investigate, to review its health and safety records, and to interview employer and employee representatives during the inspection about working conditions. One might expect that as a result of such study, OSHA inspectors will make daily judgments about what risks and safety issues most urgently require their attention." Maj. Op. at 168. But again, the question is not what the majority of this court "expects" might occur during an ordinary OSHA inspection, but what actually appears in the record of this case. As the district court found, here, OSHA, through its area director, in fact undertook a wall-to-wall inspection of the Somersworth Shoe plant. Chase and Ritchie were ordered to carry out that undertaking, not to decide for themselves "what risks and safety issues most urgently require their attention." Whatever "daily judgments" they might, in other circumstances, have been authorized to make about such issues were inapplicable here. Chase and Ritchie had no choice in these particular inspections but to comply with the mandate from their superior.

## CONCLUSION

The majority decides today that the government is immune from suit for the inspectors' negligence, based on the discretionary function exception to the Federal Tort Claims Act (FTCA). 28 U.S.C. § 2680(a). It

---

**33.** Even the majority's *legal* analysis is based on an erroneous factual predicate: that the government "has reserved to its own officials the decision about whether or not to act." Maj. Op. at 169. While OSHA as a whole retains such discretion, and has delegated it down the ranks at least as far as the area director, the latter refused to delegate such discretion to the line inspectors whose conduct the plaintiff has challenged.

rewards the agency when it undertakes to conduct a comprehensive safety inspection and then does so carelessly. And when the record is devoid of any evidence to suggest why incomplete "wall-to-wall" inspections or shoddy inspections could possibly be grounded in policy, the majority creates its justifications out of whole cloth. Such a decision violates the letter and spirit of the FTCA and flies in the face of controlling Supreme Court precedent on the subject.

I have great regard for my colleagues on this court. But however able they may be, they do not have the authority to refuse to follow a binding precedent from the Supreme Court of the United States. The Court's early treatment of the discretionary function exception may have been inconsistent or unclear as to how to apply the exception. But the decision in *Berkovitz* clarified the analysis courts must employ in such cases. *Berkovitz* also harmonized prior precedents and, as I have shown, *Gaubert* is likewise in harmony with the *Berkovitz* approach.

Unfortunately, the majority today totally misapplies the Court's rulings, indeed eschewing any analysis of *Berkovitz* whatsoever. The majority instead states its own priorities: "Even if [a government] decision may seem wrong in retrospect, or if its implementation is negligent, such decisionmaking [34] by its nature typically requires a balancing of interests (e.g., how to deploy scarce government resources in the accomplishment of worthwhile—but expensive—public needs). Congress reasonably struck this balance by requiring that, ordinarily, liability will not inhere absent an authoritative decision that a specific act should become a governmental responsibility." Maj. Op. at 169.

This does not state the applicable law according to the Supreme Court. Nowhere does the Court require "an authoritative decision that a specific act should become a governmental responsibility" before an injured party may sue in tort. On the contrary, the FTCA broadly waives sovereign immunity unless the government establishes that the employee performing the challenged

act—not his supervisor—acted within authorized discretion that was based in policy. If other members of this court are unhappy with the FTCA as it has been authoritatively interpreted by the Supreme Court, they cannot simply ignore the Court's interpretation of Congressional intent. Unless Congress amends the statute or the Court modifies its construction, this court must faithfully apply the Court's teachings. *See Wessmann v. Gittens*, 160 F.3d 790, 808 (1st Cir.1998) ("[U]nless and until the Justices reconfigure their present doctrine, it is the job of judges in courts such as this to respect the letter and spirit of the Supreme Court's pronouncements.").

The majority's mischaracterization of plaintiff's position further undermines its conclusion. In short, the majority does today what the Supreme Court has specifically warned against: it has acted "as a self-constituted guardian of the Treasury import[ing] immunity back into a statute designed to limit it." *Indian Towing*, 350 U.S. at 69, 76 S.Ct. 122.

I respectfully dissent.

---

**34.** Irving does not, of course, challenge OSHA's decision-making. She applauds the decision to pursue a wall-to-wall inspection of Somersworth

Shoe. She challenges only the negligent implementation, by subordinate employees, of the agency's decision.